UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

AUBREY LANE and JESSE LANE,

                              Plaintiffs,                          **MEMORANDUM & ORDER**
                                                                   18-CV-6110 (MKB)

                    v.

AMERICAN AIRLINES, INC.,

                              Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Aubrey and Jesse Lane commenced this action against Defendant American

Airlines, Inc. on October 31, 2018, (Compl., Docket Entry No. 1), and filed their Second

Amended Complaint ("SAC") on December 7, 2020, bringing negligence and loss of consortium

claims. (SAC ¶¶ 28–42, Docket Entry No. 45). Plaintiffs allege that Defendant's negligence

allowed an intoxicated passenger to sexually assault Aubrey Lane aboard one of Defendant's

flights. (*Id.*) On October 28, 2021, Plaintiffs moved for partial summary judgment on: (1) their

claim that Defendant permitted the unlawful boarding of a person who appeared intoxicated; (2)

Defendant's third and fifth affirmative defenses that this action is preempted by federal law; (3)

Defendant's fourth affirmative defense that Plaintiffs have failed to join necessary and/or

indispensable parties; (4) Defendant's eighteenth affirmative defense that Plaintiffs could have

obtained personal jurisdiction over an absent tortfeasor and that the absent party's culpability

may be computed into the apportionment of total culpability; (5) Defendant's sixteenth

affirmative defense that Plaintiffs' claims are barred by waiver or estoppel; (6) the existence of a

settlement raised by Defendant's seventeenth affirmative defense that Defendant is entitled to a

set-off for amounts subject to settlement or paid or payable by collateral sources; and (7) the

existence of a covenant raised by Defendant's twenty-first affirmative defense that Defendant is entitled to a set-off due to a covenant not to sue.  (Pls.' Mot. for Summ. J. ("Pls.' Mot."), Docket Entry No. 60; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 60-1.) Defendant opposes.  (Def.'s Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n"), Docket Entry No. 61.)

For the reasons set forth below, the Court (1) denies Plaintiffs' motion for partial summary judgment as to its claim that Defendant permitted the unlawful boarding of a person who appeared intoxicated; (2) grants Plaintiffs' motion for summary judgment as to Defendant's third, fourth, fifth, and sixteenth affirmative defenses; (3) grants Plaintiffs' motion for summary judgment as to the existence of a settlement or covenant raised in Defendant's seventeenth or twenty-first affirmative defenses; and (4) grants in part Plaintiffs' motion for summary judgment as to Defendant's eighteenth affirmative defense.  The Court also finds that the law of Arizona will apply to Plaintiffs' negligence claim.

## I.   Background

On May 4, 2017, Plaintiff Aubrey Lane purchased an airline ticket for Flight 3069 from Durango, Colorado to Phoenix, Arizona, and from there to New York John F. Kennedy International Airport ("JFK") on Flight 1280.  (Pls.' Stmt. of Undisputed Facts ("Pls.' 56.1") ¶¶ 1–2, Docket Entry No. 60.)  Gate agents Jessica Tarr and Ashleigh Tenifa managed the Flight 1280 boarding process, and Bret Bray, Carol Hannah, LaJuan Perkins, and Duvan Prado staffed Flight 1280 as flight attendants.  (*Id.* ¶¶ at 6–7.)  On June 16, 2017, at 11:34 PM, Aubrey Lane boarded Flight 1280 and sat in window seat 12A.  (*Id.* at ¶ 10.)  The passenger in aisle seat 12C boarded Flight 1280 at 11:31 PM, and Rene Santiago boarded at 11:42 PM and sat in middle seat 12B.  (*Id.* at ¶¶ 9, 11.)

Lane testified that she first noticed Santiago "[w]hen he got on the plane and was walking down the aisle." (Dep. of Aubrey Lane dated Aug. 31, 2020 ("Lane Dep.") 78:4–7, annexed to Pls.' Mot. as Ex. 2, Docket Entry No. 60-3.) She noticed that "he was stumbling. He was running into chairs, into seats. Like shouldering seats. Like kind of bouncing off of — off of seats as he walked down the aisle." (*Id.* at 78:20–25.) Lane testified that she "knew something was wrong with" Santiago when he got on the plane, and that "[t]he second he sat . . . next to me, I knew he was drunk." (*Id.* at 80:1–11.) She knew this because "[he] smelled." (*Id.* at 80:12–13.) As soon as Santiago sat down, he began hitting the call button and saying he wanted a drink. (*Id.* at 80:15–24.) A flight attendant then "came and told him that [they had not] even left yet" and told him to "[s]it down." (*Id.* at 82:18–21.) Lane said that Santiago sat down, but was "still fidgeting and still like wanting that drink." (*Id.* at 82:22–83:12.) When asked how she knew that Santiago wanted a drink, she could not remember "if he was saying it" or if she could tell by looking at him. (*Id.* at 83:13–25.)

The passenger in seat 12C, (Pls.' 56.1 ¶ 9; Def.'s Rule 56.1 Counter-Stmt. ("Def.'s 56.1") ¶ 9, Docket Entry No. 62), testified that Santiago was "the last, if not one of the last, individuals on the plane." (Dep. dated Feb. 18, 2021 ("12C Dep.") 22:18–23, annexed to Pls.' Mot. as Ex. 1, Docket Entry No. 60-2.) She said that he "was having trouble standing. He was having trouble walking in the aisle, finding his seat. He literally straddled [her] to get to the seat. There wasn't this, oh, hey, can you stand up or anything. It did not seem to be — he did not seem in the right state of mind." (*Id.* at 30:1–9.) She also testified that a flight attendant was following Santiago "because . . . to the best of [her] recollection, he was barely getting on board by the time it was time to leave. So a flight attendant was already somewhat helping him find his seat because he struggled to even find row 12." (*Id.* at 31:17–23.) The passenger said that in her "personal

opinion," based on Santiago's "physical appearances and the agitation that he demonstrated," Santiago was "not fit to fly." (*Id.* at 30:10–13.) She also testified that Santiago told her that he was a nervous flyer. (*Id.* at 30:17–20.) When asked if Santiago's demeanor could have been caused by nervousness, the passenger replied: "He smelled of alcohol and told us that he had been drinking a lot at — I don't know if that was at the airport or whatnot, but because he was nervous. So I, to the best of my recollection, feel that the behaviors that he was exhibiting was beyond just being nervous." (*Id.* at 30:23–31:5.) The passenger also testified that "the amount of alcohol that [Santiago] confessed to drinking . . . to [her] would not be amenable to then getting on a flight." (*Id.* at 38:18–39:1.) The passenger testified that she came to this "realization or decision" about Santiago's condition "[w]ithin the minute he sat down or stumbled down." (*Id.* at 31:6–9.) She said that Santiago attempted to order a drink before the flight even took off, but that "[a] flight attendant came and told him that he could not order drinks while they were in takeoff." (*Id.* at 29:9–18.) Santiago then took a phone call as the plane was disembarking, even though "it was . . . very much not when you're supposed to be on your phone." (*Id.* at 31:24–33:6.)

    Jorge Andino, a former American Airlines captain, was present on Flight 1280 as a passenger. (Dep. of Jorge Andino dated Dec. 3, 2020 ("Andino Dep.") 5:11–24, annexed to Pls.' Mot. as Ex. 3, Docket Entry No. 60-4.) Andino testified that he saw Santiago in the boarding area before he boarded the plane. (*Id.* at 10:7–22.) He noticed Santiago based on his behavior and "maybe, just for lack of words, assessing somebody." (*Id.* at 11:5–8.) Andino said that "just from evaluating" Santiago, "he just seemed to be kind of in a festive mood. That was it. A little bit — a little bit loud, but not, you know. . . . Just kind of stood out." (*Id.* at 11:24–12:6.) When asked what he meant by "festive mood," Andino replied that "[i]t was just his mannerism in —

acting with other people around him.  That was it.  A little bit loud, maybe, sometimes just a little bit over — over[-]friendly."  (*Id.* at 12:10–15.)  He did not recall Santiago acting "loud or overly friendly" toward the gate agent.  (*Id.* at 12:16–18.)

Andino did not remember whether he or Santiago boarded first, but testified that he probably boarded before Santiago.  (*Id.* at 12:22–13:2.)  He said that once he was onboard the plane he had an opportunity to watch Santiago board.  (*Id.* at 13:3–6.)  Andino said that Santiago "just seemed to be a little — a little bit overjoyed, you know, a little bit friendlier, a little bit above and beyond just a regular passenger boarding an aircraft."  (*Id.* at 13:7–15.)  When asked if there was anything unusual about the way Santiago stowed his carry-on bags, Andino replied: "He was just . . . a little bit — outside of his limits, maybe, just a little bit careless."  (*Id.* at 13:21–14:1.)  When asked if by "careless" Andino meant that Santiago's "balance wasn't good," (*id.* at 14:2–4), Andino replied that "he was at the point that he was just kind of . . . a little bit off balance."  (*Id.* at 14:6–8.)  Counsel asked if Santiago was "stumbling" during the boarding process.  (*Id.* at 14:9–10.)  Andino said no, replying:

> I couldn't see him stumbling.  It was a very crowded flight, but I just noticed his mannerism, you know, when he actually came to the — you know, the boarding process and then, you know, storing his bags, but to say stumbling, I — that, I honestly couldn't really pinpoint.  But it was just everything else, you know, things that happened, throwing his bags in the overhead.  One of them seemed to fall back down, and that was all.

(*Id.* at 14:12–20.)  Counsel asked if Santiago "kind of fumbl[ed] to find his seat" and Andino said yes.  (Id. at 14:21-24.)

Counsel asked if the flight attendants "would . . . have been able to see [Santiago] outside of his limits or fumbling to find his seat."  (*Id.* at 14:25–15:4.)  Andino replied that it

> was a very full flight.  It was a late flight, and they were a little bit delayed in boarding.  No, they — they couldn't have really known because there was just so much things going on that the attendants'

> duties, you know, need. So I . . . I think maybe if the gentleman had
> come in fully inebriated, there was no way the flight attendants
> could have honestly, you know, known that because it was just —
> the flight was very full.

(*Id.* at 15:6–14.) When asked if he believed that Santiago was inebriated when he boarded the

plane, Andino replied, "Oh, absolutely." (*Id.* at 15:15–18.) He said that this was based on

> his behavior at the gate, but the flight attendants could have never
> known that. I mean, it's — boarding an aircraft late at night, there's
> a lot of things that take place. You know, people are misseated and
> somebody wants this and somebody brings a dog, so the poor flight
> attendants were very well deep in the boarding process. But his
> behavior in the gate, that caught my attention.

(*Id.* at 15:23-16:5.) Once Santiago found his seat, Andino could "just hear him kind of a little bit

loud and just overly friendly." (*Id.* at 16:19–23.) Andino saw Santiago ask for drinks before the

plane took off and believed that he was served the drinks he requested. (*Id.* at 17:10–18.)

Jessica Tarr was one of the gate agents who boarded Flight 1280. (Pls.' 56.1 ¶ 7; Def.'s

56.1 ¶ 7.) She testified that she did not remember the flight. (Dep. of Jessica Tarr dated Sept.

10, 2020 ("Tarr Dep.") 5:11–14 , annexed to Pls.' Mot. as Ex. 5, Docket Entry No. 60-6.) She

did not know Lane, Santiago, or any of the flight crew or cockpit crew on Flight 1280. (*Id.* at

7:11-8:5.) Nor did she remember a man of Santiago's description. (*Id.* at 8:9–24.) She did not

recall who her supervisor was in June of 2017 and did not remember what other gate agent she

was working with that day. (*Id.* at 10:9–24.) Tarr did not think American Airlines trains its gate

agents "to scan the boarding area to look for potential intoxicated persons." (*Id.* at 15:10–14.)

She "would never board an intoxicated passenger knowingly." (*Id.* at 14:10-12.)

Ashleigh Tenifa was the other gate agent who managed the boarding of Flight 1280.

(Pls.' 56.1 ¶ 7; Def.'s 56.1 ¶ 7.) She testified that she did not remember the flight and did not

remember Santiago. (Dep. of Ashleigh Tenifa dated Dec. 9, 2020 ("Tenifa Dep.") 6:4–7, 9:22–

10:2, annexed to Pl.'s Mot. as Ex. 6, Docket Entry No. 60-7.)

Bret Bray was one of the flight attendants assigned to Flight 1280.  (Pls.' 56.1 ¶ 8; Def.'s

56.1 ¶ 8.)  He testified that he did remember the flight, specifically an altercation with Lane in

the aisle of the plane.  (Dep. of Bret Bray dated Dec. 6, 2020 ("Bray Dep.") 19:6–20, annexed to

Pl.'s Mot. as Ex. 7, Docket Entry No. 60-8.)  However, he did not observe the boarding process

on Flight 1280.  (*Id.* at 20:14–16.)  He did not remember noticing any disturbances in row 12

during his walk-through of the cabin, nor did he remember if other passengers complained about

disturbances from row 12.  (*Id.* at 25:19–25.)

Carol Hannah was a second flight attendant assigned to Flight 1280.  (Pls.' 56.1 ¶ 8;

Def.'s 56.1 ¶ 8.)  She testified that she did not remember seeing anyone boarding Flight 1280

who appeared intoxicated, nor did she remember if any passengers on the flight requested

alcohol before takeoff.  (Dep. of Carol Hannah dated Dec. 18, 2020 ("Hannah Dep.") 13:5–11,

annexed to Pl.'s Mot. as Ex. 8, Docket Entry No. 60-9.)  Hannah did not remember if she saw

Lane and Santiago board the plane and did not remember serving drinks to either of them.  (*Id.* at

18:5–21.)  She did not recall any passengers being especially loud in row 12 and did not recall a

passenger in row 12 standing out of his seat to place his alcohol order.  (*Id.* at 20:6–19.)

LaJuan Perkins was a third flight attendant assigned to Flight 1280 and the "lead flight

attendant" on the flight.  (Pls.' 56.1 ¶ 8; Def.'s 56.1 ¶ 8; Dep. of LaJuan Perkins dated Sept. 24,

2020 ("Perkins Dep.") 12:4–10, annexed to Pl.'s Mot. as Ex. 9, Docket Entry No. 60-10.)  Her

duties included greeting passengers during boarding and preparing predeparture drinks.  (*Id.* at

25:17–23.)  She testified that she did not provide any predeparture drinks to row 12.  (*Id.* at

25:24–26:2.)  Perkins did not remember the behavior of any of the passengers in row 12 during

the boarding process.  (*Id.* at 26:13–19.)  Instead, the first time she remembered seeing them was

when she went to the main cabin to speak with Lane and provide her with a passenger in-flight disturbance form.  (*Id.* at 26:20–27:7.)

Duvan Prado was the fourth flight attendant assigned to Flight 1280.  (Pls.' 56.1 ¶ 8; Def.'s 56.1 ¶ 8.)  He testified that the passengers in row 12 boarded together, "like one behind the other," and that he "saw them walk in together."  (Dep. of Duvan Prado dated Sept. 24, 2020 ("Prado Dep.") 28:14–20, 89:18–25, annexed to Pl.'s Mot. as Ex. 10, Docket Entry No. 60-11.)  On the day after the flight, Prado wrote a report regarding the incident.  (Prado Report dated June 17, 2017, annexed to Def.'s Opp'n as Ex. C, Docket Entry No. 68-1.)  The report stated that "[d]uring the inflight service everything seemed to be very normal between" Lane and Santiago.  (*Id.*)

Paula Hvasta, an American Airlines pilot, was also present on Flight 1280 as a passenger.  (Dep. of Paula Anne Hvasta dated Sept. 10, 2020 ("Hvasta Dep."), annexed to Def.'s Opp'n as Ex. E, Docket Entry No. 61-5; Def.'s Opp'n 4.)  Hvasta did not see Lane or Santiago board the plane.  (*Id.* at 39:4–7.)  She testified that she saw Lane walking to the rear of the plane twice, with a man following her.  (*Id.* at 40:22–41:2; 47:5–13.)  Hvasta described the man's gait as a "[n]ormal walking gait" and said that he did not appear to be "drunk, drugged, dazed [or] glazed."  (*Id.* at 49:19–24.)

Finally, the passenger in seat 11B testified that he did not "remember a lot of commotion" or "anything out of the ordinary" during the flight.  (*See* Def.'s Opp'n 4; Dep. dated Dec. 5, 2020, 13:8–15 ("11B Dep."), annexed to Def.'s Opp'n as Ex. F, Docket Entry No. 61-6.)

Plaintiffs allege that Santiago was visibly intoxicated when he boarded the flight, continued to drink after boarding, and sexually assaulted Aubrey Lane while aboard the plane.  (SAC ¶¶ 12–15.)

8

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Choice of law analysis

Plaintiffs claim that Defendant breached its duty of care to Plaintiffs by allowing a visibly intoxicated passenger to board the plane and continuing to serve alcohol to the passenger in

violation of Title 14, Code of Federal Regulations §§ 91.17(b) and 121.575(c).  (SAC ¶ 32.)

They argue that no conflict of laws analysis is necessary to evaluate this claim because there are

no relevant "conflicting interpretation of Title 14, Code of Federal Regulations, § 91.17(b) and

121.575(c)."  (Pls.' Mem. 12–14.)  Plaintiffs further argue that, to the extent the Court does

conduct a conduct of laws analysis, Arizona law applies because Arizona is where Defendant

"violated the federal laws allowing the intoxicated Santiago to board the red-eye to JFK."  (*Id.* at

16.)  They claim that it is not "fortuitous" that the incident occurred in Arizona because

Defendant "chose to establish an Arizona hub and staff it with Arizona employees," such that "it

was entirely foreseeable that [Defendant] might unlawfully board an intoxicated passenger in

Arizona."  (Pls.' Reply in Supp. of Pls.' Mot. ("Pls' Reply") 5–6, Docket Entry No. 63.)  They

also argue that Arizona "has shown a significant interest in offering safe air transportation."  (*Id.*

at 7.)

Defendant argues that Plaintiffs' claim that no choice-of-law analysis is necessary "is

inconsistent with their position that their claims are not preempted by federal law."  (Def.'s

Opp'n 13 n.11.)  In addition, Defendant argues that Texas law applies to this case because in

cases involving aviation, courts determine "the place of the wrong as the location where the

actual misconduct took place — not where the misconduct had an operative effect."  (*Id.* at 13–

14.)  Defendant further claims that its alleged misconduct, "*i.e.*, its failure to properly train

ground and flight crew on how to handle drunk passengers and refuse them passage," occurred in

Texas, where all of its "crew training programs are developed and delivered."  (*Id.* at 15.)

"Under the law of New York, the forum state, the first step in a choice of law analysis is

to determine whether an actual conflict exists between the laws of the jurisdictions involved."

*Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)

(citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)); *see also Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). Where there is no conflict, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted).

"Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing *Forest Park Pictures*, 683 F.3d at 433); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "New York courts confronted with a choice of law issue in torts conduct an 'interest analysis,' assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005) (quoting *Padula v. Lilarn Prop. Corp.*, 84 N.Y.2d 519, 521 (1994)); *see also Kinsey*, 991 F.3d at 176 ("In tort cases, New York 'applies the law of the state with the most significant interest in the litigation.' (quoting *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999))). "[T]he interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that people use as a guide to governing their primary conduct, or loss-allocating rules that prohibit, assign, or limit liability after the tort occurs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 49 (2d Cir. 2013) (citation and internal quotation marks omitted). Standards of care are conduct-regulating rules. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *see also Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 423 (S.D.N.Y. 2013) ("Conduct-regulating rules are defined as those that 'have the prophylactic effect of governing conduct to prevent injuries from occurring.'" (quoting

*Padula*, 84 N.Y.2d at 522)).  When a conduct-regulating rule is at issue, "the law of the jurisdiction where the [allegedly tortious acts] occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Licci*, 739 F.3d at 49 & 49 n.3 (alteration in original) (collecting cases); *see also Bullock v. Caesars Ent. Corp.*, 83 F. Supp. 3d 420, 423 (E.D.N.Y. 2015) (noting that when a conduct-regulating rule is at issue, "the law of the place of the tort 'will usually have a predominant, if not exclusive, concern'" (quoting *Padula*, 84 N.Y.2d at 522)).

"Where the defendant's misconduct and the plaintiff's injury occur in different jurisdictions, the place of the tort is the jurisdiction where the 'last event necessary' to make the defendant liable occurred." *In re September 11th Litigation*, 494 F. Supp. 2d 232, 239 (S.D.N.Y. 2007) (quoting *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195 (1985)); *see also Jakubiak v. QuantumScape Corp.*, No. 20-CV-10842, 2021 WL 5331722, at *5 (S.D.N.Y. Nov. 16, 2021) (same); *Youngman v. Robert Bosch LLC*, 923 F. Supp. 2d 411, 418 (E.D.N.Y. 2013) (same).  Notably, this principle "is not chiseled in stone, but rather gives way when it is at war with state interests so that the more general principles of interest analysis apply." *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 605 (S.D.N.Y. 2016); *see Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 57–58 (E.D.N.Y. 2000) (stating that "the 'last event necessary test' does not displace New York interest analysis"); *see also AHW Inv. P'ship v. Citigroup, Inc.*, 980 F. Supp. 2d 510, 523 (S.D.N.Y. 2013) (stating that "courts do not mechanically combine *lex loci delicti* and the 'last event necessary' test when the 'last event' at issue is not the conduct that the rule regulates").

     **i.  Although there is an actual conflict with regard to Plaintiffs' overall negligence claim, there is no actual conflict with regard to Defendant allegedly boarding a visibly intoxicated person**

In the SAC, Plaintiffs allege that Defendant acted negligently when it breached its duty of care to Plaintiffs by (1) allowing Santiago to board the plane, (2) continuing to serve him alcohol, and (3) failing to protect Lane from sexual assault. (SAC ¶ 32.) Plaintiffs seek summary judgment solely on the issue of whether Defendant "permitted the unlawful boarding of a person who appeared intoxicated, violating Title 14, Code of Federal Regulations, § 91.17(b) and § 121.575(c)."[1] (Pls.' Mot. 1.)

     **1.  There is no conflict between the interpretation of 14 C.F.R. §§ 91.17(b) and 121.575(c) by Texas and Arizona**

While Defendant argues that a choice-of-law analysis is necessary, (Defs.' Mem. 13), Defendant fails to show that there is an "actual conflict" between the rules of the relevant jurisdictions pertaining to whether Defendant failed in its duty pursuant to 14 C.F.R. §§ 91.17(b) and 121.575(c) by "permit[ting] the unlawful boarding of a person who appeared intoxicated." *See Kinsey*, 991 F.3d at 176. Defendant does not point to any "actual conflict" between Texas's and Arizona's interpretation of 14 C.F.R. §§ 91.17(b) and 121.575(c), nor does there appear to be one. *See Zuckerman v. Metropolitan Museum of Art*, 307 F. Supp. 3d 304, 316 (S.D.N.Y. 2018) ("The court will not engage in the choice-of-law analysis if there is no actual conflict.").

---

[1] In their memorandum in support of their motion for summary judgment, Plaintiffs appear to argue that 14 C.F.R. § 121.575(c) creates a private cause of action. (Pls.' Mem. 10–12.) Regardless of whether this is true, however, the SAC does not raise any such cause of action and mentions 14 C.F.R. §§ 91.17(b) and 121.575(c) only in the context of Defendant's duty of care in relation to Plaintiffs' negligence claim. (SAC ¶ 32.)

### 2. There is an actual conflict with regard to Plaintiffs' overall negligence claim

A choice-of-law analysis is necessary for Plaintiffs' overall negligence claim because an actual conflict exists between the relevant Texas and Arizona negligence law.

The elements of a negligence claim under Texas and Arizona law are similar. *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011) ("To establish a claim of negligence under Arizona law, a plaintiff must prove that (1) defendant owed plaintiff some duty, (2) defendant breached that duty, (3) defendant's breach caused plaintiff's injuries, and (4) plaintiff sustained actual damages."); *Martinez v. Walgreen Co.*, 935 F.3d 396, 399 (5th Cir. 2019) ("Texas law instructs that '[a] negligence cause of action has three elements: 1) a legal duty; 2) breach of that duty; and 3) damages proximately resulting from the breach.'" (internal citations omitted)). However, under Texas law, a party who controls the premises has a duty to protect invitees from third parties' criminal acts only if he knows or has reason to know of an unreasonable and foreseeable risk of harm. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998) (quoting *Lefmark Management Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1998)). To establish foreseeability, "the evidence must reveal 'specific previous crimes on or near the premises.'" *Id.* (quoting *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)); (*see* Pls.' Mem. at 15.) The Arizona Supreme Court, on the other hand, has held that "[f]oreseeability . . . . is more properly applied to the factual determinations of breach and causation than to the legal determination of duty" and that "[w]hether an injury to a particular plaintiff was foreseeable by a particular defendant necessarily involves an inquiry into the specific facts of an individual case." *Gipson v. Kasey*, 150 P.3d 228, 231 (Ariz. 2007) (en banc). Because this difference in analyzing duty of care and foreseeability has "a significant possible

effect on the outcome of the trial," a choice of law analysis is appropriate.  *Simon*, 124 F. Supp. 2d at 71.

### ii. Arizona law applies to Plaintiffs' negligence claim

The Court finds that Arizona law applies to Plaintiffs' negligence claim, as Arizona is closer than any other state to being "the place of the tort."  *Bullock*, 83 F. Supp. 3d at 423.

Plaintiffs' negligence claim is based on Defendant's decision to allow Santiago onto the plane; its decision to continue serving Santiago alcohol, allegedly in violation of federal regulations against serving alcohol to intoxicated passengers; its alleged failure to heed "the warning signs of sexual assault, drunkenness, and the threat posed by" Santiago, even after the flight crew was informed of his behavior; and its alleged failure to train its cabin crew and ground crew to deal with drunk passengers and to protect passengers from sexual assault.  (SAC ¶ 32.)  Most of these events occurred while the plane was in the air, making their location impossible to ascertain, but the plane departed from Arizona and the decision to allow an allegedly intoxicated Santiago onto the plane occurred in Arizona.  Although Defendant argues that any misconduct took place in a different location than the actual injury and that the place of the tort is the location of the misconduct, which Defendant argues is Texas, (*see* Def.'s Opp'n 14–15), its argument is not supported by the law.  *See HV Assocs. v. PNC Bank, N.A.*, No. 19-CV-7438, 2020 WL 5819559, at *6 (S.D.N.Y. Sept. 30, 2020) ("[W]hen 'the defendant's . . . conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.'" (quoting *Discover Grp., Inc. v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 85 (E.D.N.Y. 2004))); *In re September 11th Litigation*, 494 F. Supp. 2d at 239 ("Where the defendant's misconduct and the plaintiff's injury occur in different jurisdictions, the place of the tort is the

jurisdiction where the 'last event necessary' to make the defendant liable occurred."). The "last event necessary" to make Defendant liable the location of which can be ascertained with precision is the decision to allow Santiago to board the plane in Phoenix.

Defendant's arguments to the contrary are unavailing. First, Defendant argues that Texas is the place of the tort because "[a]ll American crew training programs are developed and delivered in Texas." (Def.'s Opp'n 15.) It claims that although Plaintiffs' motion names several of Defendant's employees and agents, it "adduces no evidence of misconduct, other than that which is derived from allegedly poor or negligent training by" Defendant. (*Id.* at 15–16.) However, not all events giving rise to Defendant's liability occurred in Texas. If the alleged incident aboard Flight 1280 had not occurred, Plaintiffs would not have a cause of action against Defendant based on its training practices alone. *See Youngman*, 923 F. Supp. 2d at 418–19 (stating that it would be "nonsensical" if the "last event necessary" to make the defendants liable were the purchase of a table saw in New York because if the plaintiff "had never used the table saw after buying it in New York . . . he would never have been injured and the defendants could not be held liable for anything at all"). The "last event necessary" to make Defendant liable occurred in Arizona and aboard Flight 1280, even if earlier events occurred in Texas.

Defendant supports its argument with a citation to *Deutsch v. Novartis Pharmaceuticals Corp.*, but that case is distinguishable. (Def.'s Opp'n 13–14.) In *Deutsch*, the plaintiffs in a lawsuit against a pharmaceutical company "sought punitive damages based upon alleged corporate misconduct on the part of" the defendant. 723 F. Supp. 2d 521, 523 (E.D.N.Y. 2010). In considering which law applied to the request for punitive damages, the Eastern District of New York noted that the bases of the request all stemmed from corporate decisions: failing to conduct adequate clinical trials, concealing information from the Food and Drug Administration,

failing to disclose information about the drug, and increasing the dosage and dosing schedule for the drug.  *Id.* at 524–25.  Thus, although the plaintiffs lived in New York and were treated with the drugs in New York, the court applied the law of New Jersey, where the drug company's corporate headquarters were located.  *Id.*  Unlike in *Deutsch*, where there were "no allegation[s]" that the relevant corporate misconduct had occurred in New York, the final acts of misconduct took place in Arizona and aboard Flight 1280.  *Id.* at 525.  *See also In re Air Crash Near Clarence Ctr., New York, on February 12, 2009*, 798 F. Supp. 2d 481, 487, 490 (W.D.N.Y. 2011) (applying the law of the state where a plane crash occurred rather than the law of the state where defendant airline was headquartered and noting that the "[p]laintiffs' punitive damages claims are not limited to what occurred in the defendants' boardroom.  Although [the] [p]laintiffs allege that punitive damages are warranted because [the] [d]efendants failed to implement adequate safety programs and negligently hired and trained their flight crews — allegations that reasonably implicate corporate decision-making and policies — they also allege that [the] [d]efendants failed to adequately supervise their flight crews and negligently operated an aircraft *in New York* in an unsafe manner, resulting in the crash").

Second, Defendant argues that Texas has a greater interest than Arizona in regulating the alleged misconduct because Texas is where "a major corporation allegedly engaged in corporate [mismanagement] to the extent requiring punitive damages."  (Def.'s Opp'n 17.)  However, while Texas does have an interest in regulating corporate mismanagement in Texas, Arizona has an equal interest in regulating negligence in Arizona.  Further, Arizona law states that "[a]ny crime, tort or other wrong that is committed by or against an aeronaut or passenger while in flight over this state is governed by the law of this state."  Ariz. Rev. Stat. § 28-8208(A); (*see* Pl.'s Mem. 18.)  While Defendants are correct that this statute does not apply because there is no

evidence that the alleged assault occurred over Arizona rather than over a different state, (Def.'s Opp'n 17 n.12), the statute nevertheless reflects Arizona's demonstrated interest in protecting airline passengers.

Third, Defendant argues that the fact that its allegedly negligent agents were posted in Arizona instead of any other location is "wholly fortuitous." (Def.'s Opp'n 15.) Although it is true that "aviation accidents — especially those occurring in interstate air travel — more frequently pose situations in which the place of actual injury is wholly fortuitous and unimportant," *Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 675 (2d Cir. 1983), (*see* Def.'s Opp'n 14), as Plaintiffs note, "[t]his is not a tragic 'fortuitous' disaster occurring somewhere along the route from Arizona to New York, crossing through numerous jurisdictions and crashing in a random location," (Pls.'Reply 5). It is not "wholly fortuitous" that Defendant's agents were posted in Arizona, where Defendant chose to post them and to operate flights. Courts in cases involving airplane crashes have similarly declined to refer to the location of the crash as "fortuitous" where it was the point of arrival or departure or it was otherwise foreseeable that the crash would have occurred there. *See Johnson v. Avco Corp.*, No. 07-CV-1695, 2009 WL 4042747, at *5 (E.D. Mo. Nov. 20, 2009) (finding that "the airplane did not fortuitously crash in Indiana" where the decedent "was an Indiana resident, owned and stored the airplane in Indiana, and was flying entirely within Indiana when he crashed"); *In re Aircrash Disaster Near Monroe, Mich. on January 9, 1997*, 20 F. Supp. 2d 1110, 1113 (E.D. Mich. 1998) (stating that "the aircrash at issue here did not occur in Michigan as the result of a mere coincidence" because "Detroit Metropolitan Airport was this flight's destination, and the crash occurred as the pilots began their final approach to the airport"); *In re Disaster at Detroit Metropolitan Airport on August 16, 1987*, 750 F. Supp. 793, 807 n.22 (E.D. Mich. 1989) (distinguishing the case from a

"classic 'fly over' case" and stating that "a crash at the 'hub' of an airline company, the destination and point of departure of substantial air traffic, is not fortuitous, in that it is foreseeable that an accident might occur there"); *Emmart v. Piper Aircraft Corp.*, 659 F. Supp. 843, 845 (S.D. Fla. 1987) (stating that the location of a plane crash was "not as fortuitous as [the plaintiffs] would have this [c]ourt believe it is" because "the only fortuity would be that the plane crash occur in one of [] two contiguous states, and the state of departure could reasonably be expected to be that state"); *Morgan Guar. Trust Co. of New York v. Garrett Corp.*, 625 F. Supp. 752, 760 n.12 (S.D.N.Y. 1986) (finding that "the site of this accident was not so fortuitous as it might seem" where "the decision to fly the plane in its impaired condition was made in New York," "almost the entire flight . . . was over New York State," and "almost all of the tortious conduct that caused the crash — the installation, maintenance, inspection, and testing of the defective parts — occurred in New York"); *see also Levy v. Marriott Int'l Inc.*, No. 08-CV-4795, 2011 WL 1542082, at *2 (E.D.N.Y. Apr. 21, 2011) ("This case does not involve a fortuitous act because both parties chose to associate themselves with the state of Massachusetts."); *Wong v. Marriott Hotel Servs., Inc.*, No. 05-CV-4524, 2009 WL 5538644, at *4 (E.D.N.Y. Dec. 18, 2009) (finding that courts have distinguished between cases where plaintiffs' connection to the event was purely fortuitous and "cases where both parties voluntarily associated themselves with the locus state").

Defendant cites to *Pescatore v. Pan. Am. World Airways, Inc.* in support of its argument but that case is distinguishable. (Def.'s Opp'n 14) *Pescatore* was a wrongful death suit against an airline after a bomb explosion caused an airplane to crash in Scotland. 97 F.3d 1, 3 (2d Cir. 1996). The bomb was placed on the plane in Frankfurt before the plane was transferred to London and embarked on a flight to New York. *See In re Air Disaster at Lockerbie, Scot. on*

*Dec. 21, 1988*, 37 F.3d 804, 811 (2d Cir. 1994), *abrogated for other reasons by Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217 (1996). The Second Circuit noted that "[a]lthough the explosion occurred over Scotland," the "causative misconduct" occurred in London or Frankfurt. *Pescatore*, 97 F.3d at 13. It held that, given that "no negligence or misconduct took place in Scotland, and . . . no damages were incurred in Scotland, there is really no reason at all why the compensability of the plaintiff's damages should be governed by Scottish law." *Id.* at 14. It ultimately applied the law of Ohio, where the wrongful death plaintiff resided and was domiciled. *Id.* at 5. Unlike in *Pescatore*, where "no negligence or misconduct took place in Scotland," Defendant's agents allegedly acted negligently in Arizona by allowing Santiago to board the plane. *Id.* at 14; *see also Simon*, 124 F. Supp. 2d at 61 ("Although in cases of mixed domicile, New York generally applies the law where the injury occurred, the court of appeals in *Pescatore* demonstrated that the site of causative misconduct also may be relevant to this inquiry.").

For the foregoing reasons, the court applies Arizona substantive law to Plaintiffs' negligence claim.

### c. Negligence claim based on the boarding of Santiago who appeared to be intoxicated

Plaintiffs seek summary judgment on their claim that Defendant "permitted the unlawful boarding of a person who appeared intoxicated, violating Title 14, Code of Federal Regulations, § 91.17(b) and § 121.575(c)." (Pls.' Mot. 1.) In support, Plaintiffs claim that "there is no evidence countering Santiago's appearance of intoxication." (Pls.' Mem. at 9.) Plaintiffs argue that some witnesses' inability to recall anything unusual about the flight does not create a genuine issue of fact, citing to case law to argue that neither "cursory allegations" nor witnesses' memory lapses can create a genuine issue of fact precluding summary judgment. (Pls.' Reply 1–

3.)  Further, Plaintiffs argue that the possibility of "irrelevant *midflight* factual disputes" are insufficient to overcome the evidence regarding boarding.  (*Id.* at 2–4.)

Defendant argues that Plaintiffs' claim that Santiago appeared intoxicated "is entirely premised on the deposition testimony of" Andino and the passenger in seat 12C and that these witnesses' accounts conflicted with each other.  (Def.'s Opp'n 6–7.)  In addition, Defendant argues that "[t]here is *plenty* of evidence in the record contradicting" these two passengers' version of events.  (*Id.* at 8.)  In support, Defendant claims that direct evidence can be found in the statement in Prado's event report that "[d]uring the inflight service everything seemed to be very normal between" Lane and Santiago, and in Hvasta's testimony that Santiago looked "normal" and that there was "nothing noteworthy in his walk or appearance" several hours into the flight.  (Prado Report; Def.'s Opp'n 8–11.)  Defendant also argues that there is circumstantial evidence in the form of Hannah's testimony that she did not recall seeing anyone board the flight who looked intoxicated, and Tarr's testimony that if she had seen an intoxicated passenger, she would have reported it to her supervisor.  (*Id.* at 11.)  Further, Defendant argues that "where a material question for trial concerns the very existence or occurrence of a condition at a particular point in time, courts have held that a witness' testimony regarding their failure to notice or recall that condition during the relevant timeframe is sufficient to defeat summary judgment."  (*Id.* at 12.)

As an initial matter, the Court notes that contrary to Defendant's claim, Prado's and Hvasta's testimony is not "direct evidence" that Santiago did not appear to be intoxicated when he boarded the plane.  Direct evidence "proves a fact without inference or presumption," while circumstantial evidence is "based on inference and not on personal knowledge or observation."  *Evidence*, Black's Law Dictionary (11th ed. 2019); *see also Tyler v. Bethlehem Steel Corp.*, 958

F.2d 1176, 1183 (2d Cir. 1992) ("Normally, 'direct evidence' is described as evidence tending to show, without resort to inference, the existence of a fact in question. This is often contrasted with 'circumstantial', or 'indirect' evidence, which requires the factfinder to take certain inferential steps before the fact in question is proved."). Because the question is whether Santiago appeared intoxicated *when he boarded the plane*, Prado's testimony about Santiago's appearance during in-flight service and Hvasta's testimony about Santiago's gait "a couple hours into the flight" provide, at most, circumstantial evidence from which an inference can be drawn as to Santiago's appearance while boarding. (*See* Prado Report; Hvasta Dep. 40:22–25.)

However, the circumstantial evidence is sufficient to preclude summary judgment on this issue. *See Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002) ("[C]ircumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment.") Prado's event report stated that "everything seemed to be very normal between" Lane and Santiago during inflight service. (Prado Report.) Hvasta testified that Santiago's gait was "normal" and that he did not look drunk when she observed him walking down the aisle of the plane a few hours into the flight. (*See* Prado Report; Hvasta Dep. 40:22–45:16; 49:3–24.) Although a few hours could be enough time for Santiago to become sober if he was intoxicated when boarding, the passenger in seat 12C and Andino testified that Santiago ordered more drinks after boarding the plane, (*see* 12C Dep. 40:1–41:13, 71:2–8; Andino Dep. 17:6–16; 18:5–12; 19:4–9), and the flight service records indicate that Santiago ordered two "liquors," (American Airlines Onboard Sales, annexed to Def.'s Opp'n as Ex. D, Docket Entry No. 68-1; *see* Def.'s Opp'n 3, 8–9). "[R]esolv[ing] all ambiguities and draw[ing] all reasonable inferences in" Defendant's favor as the non-movant, a reasonable jury could find that if Santiago had appeared intoxicated when he boarded the plane, he would have also appeared intoxicated after continuing

22

to drink during the flight.  *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 407 (S.D.N.Y. 2018) (quoting *Vt. Teddy Bear Co., Inc. v. 1-800-Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).[2]

In addition, the negative evidence presented by the testimonies of Tarr and Hannah that they do not remember seeing an intoxicated passenger and the testimonies of Perkins and the passenger in seat 12B that they do not remember anything unusual, while insufficient on their own to defeat Plaintiffs' motion for summary judgment, also provide some support for the inference that Santiago did not appear intoxicated when he boarded the plane. *See Evidence*, Black's Law Dictionary (11th ed. 2019). While "positive evidence is ordinarily to prevail over strictly negative evidence," *Moran Scow Corp. v. S.S. Boston*, 342 F. Supp. 216, 239 (S.D.N.Y. 1972), and while courts have held that negative evidence alone is not sufficient to create a

---

[2]   The Court finds less persuasive Defendant's argument that Plaintiffs' case for summary judgment "is entirely premised on the deposition testimony of Andino" and the passenger in 12C, but that the two passengers' recollections of the flight differ.  (Def.'s Mem. 3, 7.)  At most, the passengers' recollections suffer from inconsistencies that are minor in the context of a motion for summary judgment on Plaintiffs' unlawful boarding claim.  The passenger in 12C "remembered that Santiago asked for a drink pre-departure but was denied service, while Andino remembered Santiago asking for a drink pre-departure and being served." (*Id.* at 3 n.3.)  "Further, during the [f]light," the passenger in 12C "testified that Santiago left the row to go to the bathroom, and then Plaintiff followed him, while Andino remembered the reverse."  (*Id.*)  These minor inconsistencies are not meaningful in deciding Plaintiff's motion as to this claim.  While it is true that credibility issues may not be resolved on summary judgment, *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996))), "[m]inor inconsistencies on inconsequential issues are to be expected, and do not suffice to defeat summary judgment," *Phillips v. City of Middletown*, No. 17-CV-5307, 2021 WL 4462821, at *11 (S.D.N.Y. Sept. 29, 2021) (collecting cases); *see also United States v. Green*, No. 19-CR-6164, 2020 WL 5810011, at *2 (W.D.N.Y. Sept. 30, 2020) (noting that "[a] discrepancy as to . . . a minor, non material fact, particularly where it arises from a failure of recollection, does not call into question the credibility of the remainder of" a witness's testimony).  The Court does not consider the minor and irrelevant discrepancies in the two passengers' testimonies in assessing this motion for partial summary judgment.

genuine dispute of material fact, *see Savarese v. City of New York*, 547 F. Supp. 3d 305, 349 (S.D.N.Y. 2021), such evidence can nevertheless be relevant.  *See United States v. Ganias*, 824 F.3d 199, 214 (2d Cir. 2016) (explaining that forensic evidence can take the form of negative evidence); *Holmes v. Hernandez*, --- F. Supp. 3d ---, ---, 2021 WL 4244756, at *9 (N.D. Ill. Sept. 17, 2021) (explaining that negative evidence can be reliable and that "if a witness *was* in a position to see or hear something, and did not, then their testimony of not-seeing or not-hearing can be treated as testimony that the thing to be seen did not exist to be seen"); 88 C.J.S. Trial § 410 (2021) ("The weight to be given to negative evidence is for the jury to decide.").  Although not highly probative, the fact that multiple flight attendants and passengers do not remember observing a drunk passenger is relevant to a determination as to whether Santiago appeared intoxicated when he boarded the plane.

Drawing all reasonable inferences in Defendant's favor, *see Anderson*, 477 U.S. at 255, the Court denies Plaintiffs' motion for summary judgment on Plaintiffs' claim that Defendant allowed Santiago to board Flight 1280 even though he appeared intoxicated.  *See Pest v. Bridal Works of New York, Inc.*, 268 F. Supp. 3d 413, 421 (E.D.N.Y. 2017) ("Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present their case to the jury, the Court should not grant summary judgment unless 'it is quite clear what the truth is [and] that no genuine issue remains for trial.'" (citation omitted) (alteration in original) (quoting *Auletta v. Tully*, 576 F. Supp. 191, 195 (N.D.N.Y. 1983))).

### d.  Affirmative defenses

Plaintiffs seek summary judgment in relation to seven of Defendant's twenty-two affirmative defenses.  Specifically, they seek summary judgment as to (1) Defendants' third and fifth affirmative defenses, that Plaintiff's action is preempted by federal law; (2) Defendants'

fourth affirmative defense, that Plaintiffs have failed to join necessary and/or indispensable parties under Federal Rule of Civil Procedure 19; (3) Defendants' sixteenth affirmative defense, that Plaintiffs' claims are barred by the doctrines of waiver and estoppel; (4) the existence of a settlement raised by Defendants' seventeenth affirmative defense, that Defendant is entitled to a set-off for all amounts subject to settlement or paid or payable by collateral sources; (5) Defendants' eighteenth affirmative defense, that the absent parties' culpability may be computed into the apportionment of total culpability;  and (6) the existence of a covenant raised by Defendants' twenty-first affirmative defense, that Defendant is entitled to a set-off to the extent that a covenant not to sue was given to persons claimed to be liable for Plaintiffs' injury.  (Pls.' Mot. 1–2; Answer ¶¶ 56–58, 69–71, 74, Docket Entry No. 46.)  Plaintiffs argue that there is no evidence to support any of these affirmative defenses.  (Pls.' Mem. 25–29.)

Defendant argues that summary judgment on its affirmative defenses would be premature because "[d]iscovery with respect to Plaintiffs is ongoing in this case."  (Def.'s Opp'n 17–18.) With regard to its joinder defenses, Defendant also argues that contrary to Plaintiffs' argument that there is no evidence of a necessary and/or indispensable party, "it is obvious that Lane's alleged assailant — Santiago — is a potential defendant and possibly a necessary party."  (*Id.* at 18.)  In addition, Defendant argues that Plaintiffs are not entitled to summary judgment regarding apportionment "because apportionment of liability in a personal injury action is the default rule": "for persons who should have been named as defendants because they caused or contributed to a plaintiff's injuries, but were not named, Texas, New York, and Arizona law all allow their percentages of liability to be apportioned along with the named defendant(s)."  (*Id.* at 18–20.)

A district court should only grant summary judgment "[i]f *after discovery*, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case

with respect to which [it] has the burden of proof.'" *Hellstrom v. U.S. Dep't of Veterans Affairs*,
201 F.3d 94, 97 (2d Cir. 2000) (alteration in original) (quoting *Berger v. United States*, 87 F.3d
60, 65 (2d Cir. 1996)); *Berger*, 87 F.3d at 65 (concluding "the grant of summary judgment here
was premature" because the court could not "conclude that the parties had already had 'a fully
adequate opportunity for discovery' when the district court granted summary judgment" (quoting
*Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995))); *see also Sutera v. Schering Corp.*,
73 F.3d 13, 18 (2d Cir. 1995) (reversing summary judgment entered before any discovery had
taken place); *Trebor Sportswear Co., Inc., v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.
1989) (holding that the non-moving party "should not be 'railroaded' into his offer of proof in
opposition to summary judgment" and "must have 'had the opportunity to discover information
that is essential to his opposition' to the motion for summary judgment" (first citing *Celotex
Corp. v. Catrett*, 477 U.S. 317, 326 (1986); and then citing *Anderson*, 477 U.S. at 250 n.5)).

     "Rule 56(d) of the Federal Rules of Civil Procedure authorizes district courts to defer
ruling on a motion for summary judgment — or to deny the motion altogether — '[i]f a
nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts
essential to justify its opposition.'" *Ass'n of Car Wash Owners Inc. v. City of New York*, 911
F.3d 74, 83–84 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(d)(1)); *see also Sura v. Zimmer, Inc.*,
768 F. App'x 58, 59 (2d Cir. 2019) ("Rule 56(d) permits the district court to defer summary
judgment or permit additional discovery when the nonmovant files an affidavit or declaration
stating that, 'for specified reasons, it cannot present facts essential to justify its opposition.'"
(quoting Fed. R. Civ. P. 56(d))); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303–04
(2d Cir. 2003). "Rule 56 also authorizes district courts to 'allow time to obtain affidavits or
declarations or to take discovery' or to 'issue any other appropriate order.'" *Ass'n of Car Wash*

*Owners Inc.*, 911 F.3d at 83–84 (quoting Fed. R. Civ. P. 56(d)(2)–(3)).  The Second Circuit has

"held that when a party advises the court that it needs discovery to defend against a motion for

summary judgment, 'the court should defer decision of the motion until the party has had the

opportunity to take discovery and rebut the motion.'"  *Halebian v. Berv*, 548 F. App'x 641, 646

(2d Cir. 2013) (first citing Fed. R. Civ. P. 56(d); and then quoting *Com. Cleaning Servs., LLC v.

Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001)).

### i. Summary judgment as to Defendant's affirmative defenses is not premature

Defendant's argument that summary judgment is premature is unavailing.  Although

discovery in this case is still ongoing,[3] Defendant has failed to submit any affidavit or

declaration explaining why further discovery is necessary to oppose Plaintiffs 'motion.  "[T]he

failure to file an affidavit under [Rule 56(d)] is itself sufficient grounds to reject a claim that the

opportunity for discovery was inadequate."  *Paddington Partners v. Bouchard*, 34 F.3d 1132,

1137 (2d Cir. 1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*, 769

F.2d 919, 925 (2d Cir. 1985)); *see also Parker v. Fantasia*, 425 F. Supp. 3d 171, 184–85

(S.D.N.Y. 2019) (denying the plaintiff's request for additional discovery in response to a motion

for summary judgment where the plaintiff failed to submit a Rule 56(d) declaration); *Whelehan

v. Bank of America Pension Plan for Legacy Cos.*, 5 F. Supp. 3d 410, 420–21 (W.D.N.Y. 2014)

(same).  The Court therefore rejects Defendant's argument that summary judgment on these

issues is premature.

---

[3] Discovery has been ongoing since early 2019, (Report of Rule 26(f) Planning Meeting, Docket Entry No. 18), and is currently scheduled to close on April 21, 2022.  (Order dated Jan. 13, 2022.)

### ii. Defendant's preemption affirmative defense

Plaintiffs seek summary judgment on Defendant's third and fifth affirmative defenses that the action is governed by the Federal Aviation Act of 1958 ("FAA"), 49 U.S.C. § 40101 *et seq.*, and the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713, which together preempt state law standards governing aviation safety, flight operations, and air carrier rates, routes, and services.  (Pl.'s Mot. 1–3.)

Defendant does not oppose Plaintiffs' motion on this issue.  (Defs.' Mem. 5.)

"In deciding an unopposed summary judgment motion, 'the district court must still assess whether the moving party ha[s] fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.'"  *Jones v. Lamont*, 379 F. App'x 58, 60 (2d Cir. 2010) (quoting *Vt. Teddy Bear Co.*, 373 F.3d at 244).  Notably, however, "a partial opposition [to a motion for summary judgment] may imply an abandonment of some claims or defenses."  *Jackson v. Federal Exp.*, 766 F.3d 189, 196 (2d Cir. 2014); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).  Thus, "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."  *Jackson*, 766 F.3d at 196.

Defendant's memorandum states that Defendant "opposes Plaintiffs' Motion on all issues except" preemption, (Def.'s Opp'n 5), and concludes that "[f]or the foregoing reasons, except on the question of preemption, Plaintiffs' Motion for Partial Summary Judgment should be denied in its entirety."  (*Id.* at 20.)  The Court therefore finds that Defendant has abandoned its preemption defense and grants Plaintiffs' motion for summary judgment as to this defense.

       **iii.   The Court grants Plaintiffs' summary judgment motion as to Defendant's sixteenth affirmative defense and the existence of a settlement or covenant raised by Defendant's seventeenth and twenty-first affirmative defenses**

Defendant does not point to any evidence in the record supporting its sixteenth affirmative defense, that Plaintiff's claims are barred by waiver and estoppel; the existence of a settlement raised by its seventeenth affirmative defense, that Defendant is entitled to a set-off for amounts subject to settlement or paid or payable by collateral sources; or the existence of a covenant raised by its twenty-first defense, that Defendant is entitled to a set-off in relation to a release or covenant. (Def.'s Opp'n 17–18). Nor does there appear to be any such evidence as to these defenses.

"Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense," the plaintiff "may satisfy its Rule 56 burden by showing 'that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2d Cir. 1993)); *see also Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459, 2018 WL 3364388, at *1 (S.D.N.Y. July 9, 2018) ("An affirmative defense can be dismissed on a summary judgment motion when that defense is unsupported by any evidence in the record.").

The Court therefore grants Plaintiffs' motion for summary judgment on Defendant's sixteenth affirmative defense (waiver or estoppel), the existence of a settlement raised by Defendant's seventeenth affirmative defense, and the existence of a covenant not to sue raised by Defendant's eighteenth affirmative defense.

### iv. The Court grants in part Plaintiffs' summary judgment motion as to Defendant's fourth and eighteenth affirmative defenses

Defendant argues that summary judgment as to its fourth and eighteenth affirmative defenses, which concern joinder, would not be proper because, contrary to Plaintiffs' argument that there is no evidence of a necessary and/or indispensable party, "it is obvious that Lane's alleged assailant — Santiago —is a potential defendant and possibly a necessary party." (Def.'s Mem 18.) In addition, Defendants' eighteenth affirmative defense is "[t]hat Plaintiffs could with due diligence, have obtained personal jurisdiction over tortfeasor not a party to this lawsuit, and who are necessary and/or indispensable to a just adjudication of her claims, and thus the culpability of these missing or absent tortfeasors may be computed in to the apportionment of total culpability causing the subject occurrence." (Answer ¶ 71.) Defendant argues that Plaintiffs are not entitled to summary judgment regarding apportionment "because apportionment of liability in a personal injury action is the default rule": "for persons who should have been named as defendants because they caused or contributed to a plaintiff's injuries, but were not named, Texas, New York, and Arizona law all allow their percentages of liability to be apportioned along with the named defendant(s)." (Def.'s Opp'n 18–20.)

#### 1. Fourth joinder affirmative defense

Simply naming Santiago as a possibly necessary party is insufficient to survive summary judgment on Defendant's fourth affirmative defense. Defendant's only argument that Santiago is a necessary party is that "it is obvious" that Santiago is "a potential defendant." (Def.'s Opp'n 18.) There is no rule, however, that every possible defendant to a tort action is a necessary or indispensable party, indeed, the rule is that they are not. *See Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *Direct Energy Mktg. Ltd. v. Duke/Louis Dreyfus,*

LLC, 50 F. App'x 469, 473 (2d Cir. 2002) ("The fact that plaintiff might have been able to establish the liability of another entity not present in the suit . . . did not make that putative defendant an indispensable party in the existing suit."); *Allen ex rel. Allen v. Devine*, 670 F. Supp. 2d 164, 169 (E.D.N.Y. 2009) ("Generally, joint tortfeasors are not necessary parties under Rule 19(a)."); *Planning & Investing Co., S.A. v. Hemlock*, 50 F.R.D. 48, 50 (S.D.N.Y. 1970) ("Each of the defendants herein are alleged to be joint tortfeasors, however, and as such not indispensable to an action against any one of them.").

In the absence of facts or law showing that Santiago is a necessary or indispensable party, the Court grants Plaintiff's motion for summary judgment on Defendant's fourth affirmative defense. *See Home Design Servs., Inc. v. Starwood Constr., Inc.*, 801 F. Supp. 2d 1111, 1120–21 (D. Colo. 2011) (granting summary judgment on a defense of failure to join where defendants "[had] not provided any persuasive legal authority or argument to show that" the third party's role "would relieve [the defendants] of liability for their own actions or that [the third party] is an indispensable party"); *Bailey-P.V.S. Oxides, LLC v. S & K Packaging, Inc.*, No. 08-CV-1596, 2009 WL 3294862, at *2 (W.D. Pa. 2009) (granting summary judgment on defendant's affirmative defense of failure to join because "joint tortfeasors are not indispensable parties" and the defendant had not "proffered any facts or law that would support their entitlement to proceed on this defense"); *Nat'l Bank of Canada v. Artex Indus., Inc.*, 627 F. Supp. 610, 614, 616 (S.D.N.Y. 1986) (granting summary judgment where the defendant raised an affirmative defense of failure to join but "made no showing" that the allegedly indispensable party "has an unprotected interest in the case").

### 2.  Eighteenth joinder affirmative defense

Defendant's eighteenth affirmative defense is that "Plaintiffs could with due diligence, have obtained personal jurisdiction over tortfeasor[s] not a party to this lawsuit, and who are necessary and/or indispensable to a just adjudication of her claims, and thus the culpability of these missing or absent tortfeasors may be computed into the apportionment of total culpability causing the subject occurrence."  (Answer ¶ 71.)  Because, as discussed above, the Court grants Plaintiffs' motion for summary judgment on Defendant's defense that Plaintiffs have failed to join parties that are necessary and/or indispensable under Rule 19, the Court also grants Plaintiffs' motion for summary judgment as to the part of Defendant's eighteenth affirmative defense stating that "Plaintiffs could with due diligence, have obtained personal jurisdiction over tortfeasor[s] not a party to this lawsuit, and who are necessary and/or indispensable to a just adjudication of her claims."[4]

However, it is not yet appropriate at this stage in the litigation to determine the part of Defendant's eighteenth affirmative defense that concerns the extent to which any party or nonparty is liable for Plaintiffs' injuries.  The Court therefore reserves for later determination whether Defendant has satisfied the criteria for apportionment of liability under whichever state's substantive law will govern allocation of liability in this action.  *See Endurance American Specialty Ins. Co. v. William Kramer & Assocs., LLC*, No. 18-CV-192, 2020 WL 5548854, at *6 (D. Conn. Sept. 16, 2020) ("A claim for contribution is premature when judgment has not yet been obtained."); *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 353–54 (E.D.N.Y. 2006) (stating that "it would be premature to prospectively determine [insurers']

---

[4]  The Court assumes that "necessary" and "indispensable" are used in the sense that they are used in Federal Rule of Civil Procedure 19.

relative financial obligations to the plaintiff in the underlying action when no judgment has yet been obtained"); *see also Padula*, 84 N.Y.2d at 522 (explaining that New York's choice-of-law rules analyze conduct-allocating rules differently than loss-allocating rules).

### III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for summary judgment. The Court (1) denies Plaintiffs' motion as to Plaintiffs' claim that Defendant permitted the unlawful boarding of an intoxicated person; (2) grants Plaintiffs' motion as to (a) Defendants' third and fifth affirmative defenses, that this action is preempted by federal law; (b) Defendant's fourth affirmative defense, that Plaintiffs have failed to join necessary and/or indispensable parties; (c) sixteenth affirmative defense, that Plaintiffs' claims are barred by waiver and estoppel; (d) the existence of a settlement raised by Defendant's seventeenth affirmative defense, that Defendant is entitled to a set-off for all amounts subject to settlement or paid or payable by collateral sources; and (e) the existence of a covenant raised by Defendant's twenty-first affirmative defense, that Defendant is entitled to a set-off due to a covenant not to sue; and (3) grants Plaintiff's motion in part as to Defendant's eighteenth affirmative defense, that absent parties' culpability may be computed into the apportionment of total culpability.

Dated: April 8, 2022
      Brooklyn, New York

                                      SO ORDERED:

                                            s/ MKB
                                    _____
                                    MARGO K. BRODIE
                                    United States District Judge