UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

AUBREY LANE and JESSE LANE,

                           Plaintiffs,

          v.

AMERICAN AIRLINES, INC.,

                         Defendant.

---------------------------------------------------------------

**<u>FILED UNDER SEAL</u>**

**<u>MEMORANDUM & ORDER</u>**
18-CV-6110 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Aubrey and Jesse Lane brought this action against Defendant American

Airlines, Inc. on October 31, 2018, (Compl., Docket Entry No. 1), asserting negligence and loss

of consortium claims, (Second Am. Compl. ("SAC") ¶¶ 28–42, Docket Entry No. 45).  Plaintiffs

allege that Defendant's negligence allowed an intoxicated passenger to sexually assault Aubrey

Lane ("Lane") aboard one of Defendant's flights.  (*Id.*)

      Currently before the Court are (1) Plaintiffs' motion to bar any evidence of Lane's

"childhood and young adult sexual assaults"; and (2) the parties' motions to exclude the expert

opinion and proposed testimony of expert witnesses pursuant to Rule 702 of the Federal Rules of

Evidence.  Plaintiffs move to exclude the proposed testimony of Dr. Nina Rodd, a clinical

psychologist, and Dr. Gregory Saathoff, a forensic psychiatrist;[1] and Defendant moves to

---

[1]  (Pls.' Rape Shield Mot. in Limine and *Daubert* Mots. ("Pls.' Mot."), Docket Entry No. 84-9; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 84; Pl.'s Rebuttal to Rape Shield Mot. in Limine and *Daubert* Mots. ("Pls.' Reply"), Docket Entry No. 95; Def.'s Opp'n to Pls.' Mot. ("Def.'s Opp'n"), Docket Entry No. 92; Rep. of Dr. Nina Rodd ("Rodd Rep."), annexed to Decl. of Daniel Z. Rivlin ("Rivlin Decl.") as Ex. F, Docket Entry No. 86-2; Addendum to Rodd Rep. ("Rodd Addendum"), annexed to Pls.' Mot. to Seal as Ex. 4, Docket Entry No. 84-4; Rep. of Dr. Gregory Saathoff ("Saathoff Rep."), annexed to Rivlin Decl. as Ex. G, Docket Entry No. 86-2.)

exclude the proposed testimony of Kim E. Petersen, a transportation security expert, and Dr. Sheri Vanino, a clinical psychologist.[2]

For the reasons set forth below, the Court denies Plaintiffs' motion to exclude evidence of Lane's history of sexual abuse and assault; grants in part and denies in part Plaintiffs' motion to exclude the expert opinions of Drs. Nina Rodd and Gregory Saathoff, and Defendant's motion to exclude the expert opinion of Kim E. Petersen; and denies Defendant's motion to exclude the expert opinion of Dr. Sheri Vanino.

## I. Background

The Court assumes familiarity with the facts as set forth in its prior decision granting in part and denying in part Plaintiffs' motion for partial summary judgment (the "April 2022 Decision"). (Apr. 2022 Decision, Docket Entry No. 70.) The Court therefore provides only a summary of the relevant facts and procedural history.

On June 26, 2017, at 11:34 PM, Lane boarded American Airlines Flight 1280 (the "Flight") from Phoenix to New York and sat in window seat 12A. (*Id.* at 2.) The passenger assigned to seat 12B, Rene Santiago, boarded shortly after. (*Id.*) Lane testified that Santiago was "stumbling" as he walked down the aisle to his seat and that "[t]he second he sat . . . next to me, I knew he was drunk." (*Id.* at 3 (alteration in original) (quoting Dep. of Aubrey Lane dated Aug. 31, 2020, at 80:1–11, Docket Entry No. 60-3).) Lane said that Santiago was visibly

---

[2]  (Def.'s Mot. to Exclude the Expert Opinions of Kim E. Petersen and Dr. Sheri Vanino ("Def.'s Mot."), Docket Entry No. 86; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 86-1; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 96; Pl.'s Resp. to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 91; Rep. of Kim E. Petersen ("Petersen Rep."), annexed to Rivlin Decl. as Ex. C, Docket Entry No. 86-2; Rep. of Dr. Sheri Vanino ("Vanino Rep."), annexed to Rivlin Decl. as Ex. D, Docket Entry No. 86-2.)

intoxicated when he boarded the flight, that he repeatedly asked for and was served more alcohol once he boarded, and that he sexually assaulted her during the flight as a result. (*Id.* at 3–8.)

Based on these allegations, Plaintiffs brought this case claiming that Defendant negligently allowed Santiago to board the flight in a visibly intoxicated state and then served him more alcohol on board, in violation of federal regulations. (SAC ¶¶ 28–42.) During discovery, the parties took depositions of various passengers, the gate agents who allowed Santiago on board, and members of the crew of the Flight. (Apr. 2022 Decision 3–8.) The evidence includes reports from Defendant's experts discussing sexual abuse that Lane experienced as a child and young adult. (*See* Pls.' Mem. 4–6; Rodd Rep. 3–5; Saathoff Rep. 3–11.)

Plaintiffs moved in April of 2023 to exclude evidence of any sexual abuse or assaults that Lane suffered prior to the sexual assault alleged in this case. (*See* Pls.' Mem. 1–9.) The parties also filed their *Daubert* motions, each seeking to exclude two expert witnesses. (*See* Pls.' Mem.; Def.'s Mem.)

## II.  Discussion

### a.  Plaintiffs' motion to exclude evidence of past sexual abuse and assaults

Plaintiffs argue that the Court should preclude any evidence of Lane's "childhood and young adult sexual assaults." (Pls.' Mem. 1.) Specifically, Plaintiffs argue that the reports of Drs. Rodd and Saathoff mention sexual abuse and assaults that Lane experienced as a child and young adult, and that they do so "in an effort to minimize the damages owed" as a direct result of the assault at issue in this case. (*Id.*) In support, Plaintiffs argue that Rule 412 of the Federal Rules of Evidence "makes sexual history evidence presumptively inadmissible in civil cases," that the rule is intended to prohibit inquiry into private sexual histories and to "prevent[] defendants from putting the victim rather than the defendant . . . on trial," and that this rationale applies with equal force to this case to preclude admission. (*Id.* at 3–4 (citation and internal

quotation marks omitted).)  In addition, Plaintiffs contend that the past sexual trauma that Lane experienced was too long ago to have probative value in this case, and that "other experiences of victimization" that are more recent sufficiently establish her preexisting mental health conditions.  (*See id.* at 4–6.)  Finally, Plaintiffs argue that damages in this case "cannot be apportioned by a reasonable determination" among the various possible sources of Lane's alleged injury, and therefore the Court should refuse to make any apportionment of its own.  (*Id.* at 6–8.)  Plaintiffs argue that regardless of any preexisting condition that made the extent of harm unforeseeable to Defendant, Defendant is liable for the full extent of the harm.  (*Id.* at 8–9.)

Defendant first responds that Rule 412 is inapplicable because Defendant seeks to use evidence of Lane's past sexual trauma "merely . . . to evaluate the causes and extent of [Lane's] psychological condition, not to demonstrate any type of predisposition [Lane] had towards sexual behavior or a specific narrative of a prior encounter."  (Def.'s Opp'n 5–6.)  Defendant next argues that even if Rule 412 applies, the evidence at issue would be admissible under the rule's exception for otherwise excludable evidence "if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party."  (*Id.* at 8–18 (quoting Fed. R. Evid. 412(b)(2)).)

"Federal Rule of Evidence 412 forbids the admission of evidence 'in a civil or criminal proceeding involving alleged sexual misconduct' that is offered to prove that a 'victim engaged in other sexual behavior' or that a victim has a 'sexual predisposition.'"  *United States v. Perez*, No. 20-1982, 2022 WL 1421408, at *1 (2d Cir. May 5, 2022) (quoting Fed. R. Evid. 412(a)); *see also United States v. Rivera*, 799 F.3d 180, 184 (2d Cir. 2015) ("Federal Rule of Evidence 412(a)(1) provides that in a case involving allegations of sexual misconduct, 'evidence offered to prove that a victim engaged in other sexual behavior' is inadmissible." (quoting Fed. R. Evid.

412(a)(1))).  "The rule, however, is not categorical or absolute."  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir. 2014).  It provides that "[i]n a civil case, the court may admit evidence [of] a victim's sexual behavior . . . if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party."  *Id.* (alterations in original) (quoting Fed. R. Evid. 412(b)(2)).  Rule 412 aims to:

> safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process.  By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.

Fed. R. Evid. 412, advisory committee's note to 1994 amendments; *Wolak v. Spucci*, 217 F.3d 157, 160 (2d Cir. 2000) (quoting same).

Beyond these enumerated exceptions to Rule 412, courts have found that, when a plaintiff alleges emotional or psychological injury, evidence of prior sexual abuse or assaults is admissible to show other sources of that injury, *see, e.g.*, *Doe v. Bridges to Recovery, LLC*, No. 20-CV-348, 2021 WL 4690830, at *16 (C.D. Cal. May 19, 2021) ("[Rule] 412 is inapplicable to the evidence of prior sexual assaults because that evidence is not being offered to prove that [the plaintiff] engaged in other sexual behavior or to prove her sexual predisposition.  Rather, the evidence of prior sexual assaults is offered to identify other sources of emotional distress."); *Delaney v. City of Hampton*, 999 F. Supp. 794, 796 (E.D. Va. 1997) (admitting evidence of the plaintiff's history of prior sexual abuse and other incidents because "these stressors may have contributed to her current psychiatric problem" and thus are relevant to causation); *cf. Gowens v. Tidwell*, No. 10-CV-10518, 2013 WL 2285446, at *3 (E.D. Mich. May 23, 2013) (excluding evidence of the plaintiff's sexual history because "[t]here [were] no allegations that [the plaintiff] was the subject of prior sexual abuse or assault or other trauma that could have contributed to her

mental distress before the alleged sexual assault"), and to determine damages, *see, e.g.*, *Montanez v. City of Syracuse*, No. 16-CV-550, 2019 WL 4257134, at *4 (N.D.N.Y. Sept. 9, 2019) ("Defendants have described the past trauma evidence that they seek to introduce and . . . proffered evidence that following the February 2015 incident, [the p]laintiff sought mental health treatment for 'past trauma' and 'this recent one.'  Thus, evidence concerning past sexual trauma may be relevant to a determination of damages." (citations omitted)).

The Court finds that Rule 412 is not applicable to evidence of Lane's trauma history, including any sexual abuse or assaults that she experienced prior to the Flight, to the extent Defendant offers such evidence to prove causation of Lane's psychological injuries and to apportion damages.  (*See* Def.'s Opp'n 1–2.)  This proffered evidence does not fall into one of the two narrow categories of evidence barred by Rule 412: (1) "evidence offered to prove that a victim engaged in other sexual behavior," or (2) "evidence offered to prove a victim's sexual predisposition."  Fed. R. Evid. 412(a).  Accordingly, Rule 412 is not applicable and does not bar admission of Lane's history of sexual abuse and assault to identify sources of her trauma other than the alleged sexual assault on the Flight or as evidence of her damages.

**b.   The parties' *Daubert* motions**

**i.   Standard of review**

"The admission of expert testimony is governed primarily by the Federal Rules of Evidence."  *United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *1 (2d Cir. May 15, 2023).  Rule 702 of the Federal Rules of Evidence was recently amended, and this new Amendment took effect December 1, 2023.  The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical,

> or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3] "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (same); *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citations omitted)).

---

[3] Prior to the Amendment, Rule 702 read:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011) (amended 2023). Although the language remains largely similar, the Court is mindful of the purposes of the two amendments, as set forth in the advisory committee's notes.

The purpose of the first amendment was to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendment was aimed at courts that had erroneously held that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* Rather, the Rule 104(a) preponderance standard is to be applied before a court admits the expert opinion in the first place. *See id.* The second amendment served to "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the district court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting same). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (quoting same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (similar) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999)). The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 150 (citation and internal quotation marks omitted).

The district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)). Expert

testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (quoting same).  When an

expert's opinion is based on data or methodologies "that are simply inadequate to support the

conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion

testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (quoting

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also Nimely*,

414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered." (alteration in original) (quoting *Gen. Elec.*, 522 U.S. at 146)).

Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of

Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re*

*Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303

F.3d at 267); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019)

(same).

### i.    Plaintiffs' motion to exclude portions of Dr. Nina Rodd's opinion

Plaintiffs move to exclude portions of the expert opinion of Defendant's clinical and

forensic psychologist, Dr. Nina Rodd.  (Pls.' Mem. 20–23; *see also* Rodd Rep.; Rodd

Addendum.)

### 1.    Dr. Rodd's background and expert opinion

Dr. Rodd is a "mental health professional" with twenty-one years of experience as a

"licensed clinical and forensic psychologist."  (Rodd Rep. 1.)  She has worked with patients

experiencing "trauma including sexual harassment and sexual assault" in clinical settings,
psychiatric hospitals, and forensics arenas. (*Id.*)

Defendant retained Dr. Rodd to "determine the psychological impact, if any, as a result of
the alleged sexual assault of Ms. Lane on an overnight American Airlines flight from Phoenix,
Arizona, to New York City on June 16, 2017." (*Id.*)  In preparing her report, Dr. Rodd
conducted a two-and-a-half-hour clinical interview and a one-and-a-quarter-hour psychological
test of Lane via Zoom. (*Id.*)  In addition, Dr. Rodd reviewed the expert report and raw data of
Dr. Sheri Vanino, the psychological evaluation and assessment of Lane by Dr. Alise Duclos, the
pleadings, interrogatories, and select deposition transcripts in this case, and Lane's medical,
psychological, and in-patient records and social media postings. (*Id.* at 1–2.)  In preparing her
addendum, Dr. Rodd reviewed additional material, including Dr. Duclos' raw test data from
Lane's neuropsychological evaluation, Dr. Saathoff's expert report and video interview of Lane,
Lane's three journals, and various deposition transcripts. (Rodd Addendum 1–3.)



Dr. Rodd concluded that Lane suffers from ███████████████, antisocial
personality features, ██████████, post-traumatic stress disorder ("PTSD"), ██████
██████, and ███████████; exaggerates her symptoms; and demonstrates "a pattern of
avoiding feelings of remorse by creating narratives to rationalize and justify her own behavior
and rely on a victim role." (Rodd Rep. 25–27.)  In addition, Dr. Rodd concluded that, "with a
reasonable degree of psychological certainty," "the alleged sexual assault, if it actually occurred,
could have caused the exacerbation of Ms. Lane's existing PTSD, but not her existing ██████
██████, ███████████, and Antisocial Personality Features" and that her
"[p]sychological profile prior to the alleged incident more likely than not is consistent with
impulsive and risk taking behavior." (*Id.* at 27; *see also* Rodd Addendum 3.)  In her addendum,

Dr. Rodd found it "notable" that in Lane's three journals, she only referenced the "rape" in "one short sentence in a total of [sixty-four] pages" and that "none of the records of her psychological treatments . . . [made] any reference to the alleged sexual assault on the American Airline flight, nor was there any record of treatment provided to address any trauma caused by the alleged sexual assault."  (Rodd Addendum 2.)  Dr. Rodd further concluded, after manually inputting the previously unavailable raw data used by Dr. Duclos,[4] that Lane's psychological test results administered by Dr. Duclos "can only be assumed to be invalid — therefore, no clinical interpretation is provided" likely due to exaggeration, and the only valid test result was the "Trauma Symptoms Inventory-2 that Dr. Vanino" administered, which indicated PTSD.  (*Id.* at 3.)

In her report, Dr. Rodd explained that she administered to Lane a Personality Assessment Inventory ("PAI"), "a 344-item self-report instrument whose items are answered on a [four]-point scale and comprise [twenty-two] nonoverlapping scales that measure constructs related to profile validity, psychiatric diagnoses, treatment-related issues, and interpersonal styles."  (Rodd Rep. 10–11.)  Based on the resulting PAI clinical profile, Dr. Rodd concluded that Lane suffered from anxiety, aggression, ███████████████, trauma, depression, anti-social personality, ████ psychosis, alcohol use, and suicidal ideations, although given "the possibility of an element of exaggeration of complaints and problems" by Lane, the results "may overrepresent the extent and degree of symptomatology" or "the actual degree of psychopathology" as viewed by an objective observer.  (*Id.* at 11–13.)  In support, Dr. Rodd

---

[4]  In her addendum, Dr. Rodd explains that, at the time she prepared her initial report, she "did not have access to Dr. Duclos' . . . raw psychological and neuropsychological test data from Ms. Lane's neuropsychological evaluation" because "Dr. Duclos had previously refused to provide the data."  (Rodd Addendum 2–3; *see also* Rodd Rep. 1 n.* ("Dr. Duclos had refused to provide raw data, so this report is subject to supplementation of the raw data.").)

explained that her results matched those of Dr. Duclos, who indicated that Lane's "response pattern suggested she may have attempted to present herself in an overly negative way" and concluded that Lane was "experiencing a significant level[] of aggression, anxiety symptoms, depressive symptoms, somatic concerns, ███████████████ features, problem[s] with concentration and cognitive functioning, and trauma-related concerns." (*Id.* at 15.)  In addition to the PAI, Dr. Rodd conducted a Beck Depression Inventory test, a self-report subjective test, which indicated that Lane suffers from moderate to severe depression.  (*Id.*)  Dr. Rodd concluded that, given Lane's "pattern of exaggeration and [of] reporting her symptoms in an amplified way, . . . her actual symptoms are more likely than not at a milder level than what she reported."  (*Id.*)

In diagnosing Lane, Dr. Rodd also evaluated the criteria for ███████████████ ██████, ████████, and PTSD described in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") against the information she obtained from the interviews with Lane and the documents she reviewed.  (*Id.* at 16–26); *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).  She concluded that her objective tests, as well as Dr. Vanino's and Dr. Duclos' objective tests, indicated that Lane (1) has "lifelong ████████████████████ and Antisocial Personality Features," (2) "suffers from a ████████████ which is a lifelong condition," and (3) "is suffering from Posttraumatic Stress Disorder."  (Rodd Rep. 25.)  Dr. Rodd further explained that ████████ ████████████ features include "impulsivity, emotional instability, risk taking self-sabotaging behavior, intense anger, and difficulty controlling anger," and antisocial personality features include "having no regard for authority, impulsivity, and manipulative behavior."  (*Id.*)  She further explained that ████████████ features include "decrease[d] need for sleep, inflated self-esteem, distractibility[,] and excessive engagement in activities with [a] high risk of painful

results such as sexual indiscretion." (*Id.*) Finally, she explained that PTSD includes "recurrent involuntary and intrusive distressing memories of the traumatic events, and prolonged psychological distress at exposure to internal or external cues that resemble an aspect of the traumatic event." (*Id.*) "Based on the above diagnosed and described disorders," Dr. Rodd concluded, Lane "has the propensity in engaging risky behavior and the impulsivity to engage in risky behavior." (*Id.*)

In her conclusion, Dr. Rodd criticized Dr. Vanino for focusing "only on [Lane's] Depression and PTSD as the impact of the alleged sexual assault" without shedding light on her "features of ▉▉▉▉▉ and anti-social personality disorders" or "▉▉▉▉▉ of her ▉▉▉▉▉ and her impulsivity, all of which [Lane] had experienced from her teens and early adulthood." (*Id.* at 16.) Dr. Rodd also disagreed with portions of Dr. Vanino's expert report, including Dr. Vanino's "separate diagnosis" of major depression, since ▉▉▉▉▉ "consider[s] episodes of depression" according to the DSM-V, and her "separate diagnosis of anxiety disorder, since such episodes are part of ▉▉▉▉▉ ▉▉▉▉▉" (*Id.* at 26–27.)

### 2. The Court excludes in part and admits in part Dr. Rodd's expert report

Plaintiffs argue that Dr. Rodd's expert report should be excluded as unreliable because she "never supports her opinions with peer reviewed publications or citations" and merely "cuts and pastes from a diagnostic manual the descriptions of certain psychiatric conditions" without "attempt[ing] to link her causation conclusions to that or any other supporting literature." (Pls.' Mem. 21–22.) Plaintiffs further argue that Dr. Rodd fails to support how Lane's single reference to the "rape" in her journals "proves anything" and "simply pointing out a journal entry fact without more, 'would usurp the province of the judge to instruct on the law, or of the jury to

13

make factual determinations,'" (*id.* at 22 (quoting *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09-CV-2675, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2022))), and "is not an opinion supported by any empirical data," (*id.* at 23). In addition, Plaintiffs argue that Dr. Rodd does "not provide a differential diagnosis" nor does she "attempt to differentiate the [twenty-nine] diagnos[e]s [Lane]'s [twenty-five] treating physicians found." (Pls.' Reply 7.)

Defendant argues that "Dr. Rodd is qualified to opine upon [Lane]'s mental condition and its cause, her methodologies in arriving at her conclusions were reliable, and her testimony is ultimately helpful to the trier of fact." (Def.'s Opp'n 38.) In support, Defendants argue that Dr. Rodd's methodology was reliable because she conducted a differential diagnosis, evaluating events that occurred before *and* after the Flight and ruling out possible alternative causes of Lane's mental condition, and demonstrated that her opinion "is based on a review of data or information . . . with sufficient indicia of reliability" as she "reviewed the same court documents, medical records, psychological test results, and other evaluative measures that Dr. Saathoff and Dr. Vanino assessed when making her diagnosis of [Lane]." (*Id.* at 35–36.) Defendants further argue that Dr. Rodd cites "an abundance of scientific literature when supporting her diagnosis of [Lane], including the DSM-V," and "provide[s] an analytical link to all the pertinent facts and literature supporting her diagnosis." (*Id.* at 36.) In addition, Defendants argue that "Dr. Rodd's reference to some of [Lane]'s journal entries following the alleged incident on the Flight" was "a single observation made by Dr. Rodd amongst the totality of information she considered in her analysis when arriving at her overall conclusions." (*Id.* at 37.) Finally, Defendants argue that Dr. Rodd's report "directly addresses a critical element of Plaintiffs' claims — the [apportionment] of damages" and "the critical issue of determining the extent that Plaintiff's pre-

14

existing mental conditions were aggravated or exacerbated by the alleged incident on the Flight," which are clearly helpful to the trier of fact.  (*Id.* at 37–38.)

Dr. Rodd's diagnoses that Lane suffers from ███████████████████ ██████, and PTSD are reliable.  Her opinions are based on conventional methods for rendering a psychological diagnosis, including a review of Lane's medical records and her own nearly four-hour examination of Lane.  *See Weiss v. Macy's Retail Holdings Inc.*, No. 16-CV-7660, 2019 WL 6174350, at *2 (S.D.N.Y. Nov. 19, 2019) (admitting a psychologist's diagnosis that the plaintiff did not have a specific learning disorder after she conducted a two-day, in-person examination of the plaintiff and extensively reviewed discovery documents); *Tardif v. City of New York*, 344 F. Supp. 3d 579, 600 (S.D.N.Y. 2018) (admitting a psychologist's diagnosis of a plaintiff's mental health conditions after he personally observed the plaintiff, conducted two three-hour clinical interviews with the plaintiff, and reviewed the plaintiff's medical records and prior deposition testimony because such preparation "is generally a reliable way to reach an expert opinion related to a psychological condition" (first citing *O'Loughlin v. USTA Player Dev. Inc.*, No. 14-CV-2194, 2016 WL 5416513, at *5 (S.D.N.Y. Sept. 28, 2016); then citing *Tchatat v. City of New York*, 315 F.R.D. 441, 445 (S.D.N.Y. 2016); and then citing *Schoolcraft v. City of New York*, No. 10-CV-6005, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015))); *Schoolcraft*, 2015 WL 6444620, at *2 (admitting testimony about a plaintiff's PTSD diagnosis that was based on a ninety-minute interview with the plaintiff, a review of depositions by the doctors that assessed the plaintiff, and a review of medical records).  As part of her interviews with Lane, Dr. Rodd administered the PAI and the Beck Depression Inventory test.  (Rodd Rep. 10–15.)  In her report, she applied the criteria for █████████████████, █████, ██████, and PTSD described in the DSM-V — "one of the basic texts used by psychiatrists and

15

other experts" to diagnose patients, *see Hall v. Florida*, 572 U.S. 701, 704 (2014) — to the information she obtained from her interviews with Lane and documents she reviewed to arrive at her diagnoses of Lane.  (Rodd Rep. 16–26); *see, e.g., Weiss*, 2019 WL 6174350, at *2 (concluding that a psychologist's methodologies were "sufficiently reliable" because the expert "gathered a variety of data points, including through her own examination of [the plaintiff] and review of documentary evidence," and she "explain[ed] the tests she administered and how she applied the criteria set forth in the DSM-V to the data she gathered"); *Tardif*, 344 F. Supp. 3d at 600 (concluding that a psychologist "used reliable methodology to conclude that [the plaintiff] suffers from PTSD, major depressive disorder, and generalized anxiety disorder" when he used a personality inventory test and the criteria described in the DSM-V to diagnose the plaintiff). Accordingly, because Dr. Rodd used reliable methodology to conclude that Lane suffers from ██████████████████, ████████████ and PTSD, she may testify to those conclusions.[5]

However, the Court finds that there is "too great an analytical gap between the data and the opinion proffered" to admit Dr. Rodd's proposed testimony regarding causation or exacerbation.  *Nimely*, 414 F.3d at 396 (quoting *Gen. Elec.*, 522 U.S. at 146).  Dr. Rodd concluded that, "with a reasonable degree of psychological certainty," the alleged sexual assault, if it actually occurred, could have caused the exacerbation of Ms. Lane's existing PTSD, but not her existing ██████████, ████████████████████, and Antisocial Personality Features" without explaining why the sexual assault could exacerbate one existing medical

---

[5]  Dr. Rodd did not, however, describe or apply the criteria in the DSM-V for Lane's diagnoses of "████████████, Moderate" or "████████████, Moderate," (Rodd Rep. 16), although she did conclude that Lane's PAI results indicated "alcohol use," (*id.* at 13). She also did not describe, but ultimately applied, the criteria in the DSM-V for Lane's diagnosis of Antisocial Personality Features.  (*Id.* at 16, 26.)

condition without exacerbating others.  (Rodd Rep. 26 (concluding that the alleged sexual assault could exacerbate Lane's "existing diagnosis of PTSD" that she suffered "from earlier experiences in her life all the way back to her childhood" but could not exacerbate "the other conditions of ███████████, ████████████████, Antisocial Personality Features, ████████████, and ██████████████," which "were fully present in Ms. Lane's life prior to the alleged sexual assault").)  Without any explanation of this distinction, the Court finds that Dr. Rodd's report and proffered testimony regarding causation or exacerbation "lack[s] reliable foundation because [she] provided no explanation as to how [her] opinion was based on [her] experience or medical education," *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016), and "is connected to existing data only by the *ipse dixit* of the expert," *Nimely*, 414 F.3d at 396 (quoting *Gen. Elec.*, 522 U.S. at 146).

Because Dr. Rodd's "expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero*, 424 F.3d at 253 (quoting *Amorgianos*, 303 F.3d at 266).  Accordingly, the Court excludes Dr. Rodd's expert opinion concerning the causation or exacerbation of Lane's medical conditions.

For the above reasons, the Court (1) admits Dr. Rodd's expert opinion concerning her diagnoses that Lane suffers from ████████████████, ██████████, and PTSD, (Rodd Rep. 25–27); and (2) excludes Dr. Rodd's expert opinion concerning her proposed testimony regarding causation or exacerbation, (*id.* at 27; *see also* Rodd Addendum 3).

### ii.   Plaintiffs' motion to exclude portions of Dr. Gregory Saathoff's opinion

Plaintiffs move to exclude portions of the expert opinion of Defendant's forensic psychiatrist, Dr. Gregory Saathoff.  (Pls.' Mem. 9–20; *see also* Saathoff Rep.)

### 1.   Dr. Saathoff's background and expert opinion

Dr. Saathoff is "a clinician who has assessed and treated military and civilian individuals who suffer from psychiatric disorders including PTSD, traumatic brain injuries, mood disorders, anxiety disorders, thought disorders, substance use disorders, and personality disorders." (Saathoff Rep. 1.)  He has "assessed and treated victims of sexual trauma and abuse within inpatient and outpatient settings" and provides "psychiatric training to third- and fourth-year medical students, residents and fellows." (*Id.*)  His experience includes serving as a full-time professor "on the Faculty of the University of Virginia School of Medicine for [thirty-five] years" and as a "psychiatric case consultant and trainer for the FBI's Behavioral Analysis Unit for [twenty-six] years." (*Id.*)

Defendants retained Dr. Saathoff to "determine the psychiatric impact, if any, resulting from the alleged sexual assault of Ms. Aubrey Lane during an overnight American Airlines flight from Phoenix, AZ to New York City, NY on 16 June 2017." (*Id.*)  In preparing his report, Dr. Saathoff conducted a six-hour psychiatric interview of Lane via Zoom and reviewed the expert reports of Dr. Rodd and Dr. Vanino, the psychological evaluation and assessment of Lane by Dr. Duclos, the pleadings, interrogatories, and select deposition transcripts in this case, and Lane's medical, psychological, and in-patient records and social media postings. (*Id.* at 1–2.)  In his report, Dr. Saathoff concluded that Lane suffers from ███████████████████, PTSD, antisocial personality features, including an ability to exaggerate and willingness to manipulate those close to her, ████████ and dependence, and "the patient role," or a "victim narrative." (*Id.* at 27–36.)

Dr. Saathoff concluded that Lane's psychological testing "is consistent with diagnoses of [PTSD]." (*Id.* at 36.)  He also concluded that Lane's "history is prominent for significant trauma

dating back to ███████████████████████████████" and that "[h]er sexual traumatization continued through childhood and early adulthood," all of which preceded the alleged sexual assault on the Flight.  (*Id.* at 31.)  In support, he cited to Lane's recollection of her past traumas.  (*Id.*)  Although Lane was only "able to name some [traumas], but did not spontaneously recall others," Dr. Saathoff could not determine "[w]hether this [was] due to memory issues or something else entirely."  (*Id.*)  In addition, he concluded that "the trauma she experienced from ████████████ continues to have an impact" as it triggered Lane in 2021, despite having occurred as a very young child.  (*Id.* at 4–5, 31.)  Ultimately, Dr. Saathoff concluded that, "with a reasonable degree of medical certainty," "the alleged sexual assault, if it actually occurred, had the potential to exacerbate Ms. Lane's longstanding PTSD."  (*Id.* at 36.)

Dr. Saathoff also concluded that Lane's "history, psychological testing[,] and positive response to Dialectical Behavior Therapy (DBT) all indicate a strong correlation with a diagnosis of ████████████████," which predated the Flight.  (*Id.* at 27–28.)  In support, he cited the criteria listed in DSM-V, the psychological testing conduct by Dr. Duclos, and the reports of Dr. Rodd and Dr. Duclos.  (*Id.*)  He also cited Lane's descriptions of "self-mutilations" — "[h]er self-acknowledged exaggeration of hurt that her mother had initially described to her" and "her self-mutilation following her boyfriend's break-up with her" that "result[ed] in hospitalization in 2014" — as consistent with individuals diagnosed with ██████████ ████. (*Id.*)  In addition, Dr. Saathoff found that Lane's "strong interest in Dialectical Behavior Therapy" — a therapy "designed specifically for individuals who suffer from ████████████████" — was another strong indication that Lane has ████████ ████████████. (*Id.* at 28.)

In addition, Dr. Saathoff concluded that Lane's "reliance on multiple treatment facilities and multiple nurse practitioners as prescribers has led to unnecessary ███████████ which has been ███████████████████████."[6] (*Id.* at 29.) In support, he cited evidence that Lane was prescribed "medications 'off-label' for non-FDA approved treatments," such as gabapentin for psychiatric disorders, and medications subject to abuse, such as gabapentin and Wellbutrin. (*Id.*) He also found it concerning that Lane was prescribed two antipsychotic medications, Zyprexa and Seroquel, without a diagnosed psychotic disorder and because Zyprexa and Seroquel should not be prescribed together due to major, negative potential interactions between the two medications. (*Id.*) In addition, he found that Lane has been prescribed hydroxyzine in two forms despite Dr. Saathoff never having seen such a case and finding "no support whatsoever in the literature to justify [that] prescribing practice." (*Id.* at 30.) He further found it likely that Lane's prescription for lithium, which is frequently used in the treatment of ████ ████████████ and is widely known to affect thyroid function, "induced hypothyroidism" and "carries with it psychiatric symptoms similar to depression." (*Id.* at 29, 33–34.) Despite Lane's contention that "there were only a few psychiatrists in the Durango area," Dr. Saathoff concluded that there are "nine psychiatrists in Durango who treat adults," whom Lane has never sought or received treatment from. (*Id.* at 30.) Ultimately, he concluded that "[u]njustified ██████████

---

[6] Dr. Saathoff defined ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████
(Saathoff Rep. 30 (citation omitted).)



████████ in adults with depression may result in unnecessary adverse drug events and even ████████████"[7] (*Id.* (citation omitted).)

Dr. Saathoff also concluded that "████████ has been a prominent component throughout most of Ms. Lane's life and has profoundly affected her ability ████████████, ████████████" (*Id.*)  He further concluded that Lane "has obtained ████ ████," such as gabapentin, Wellbutrin, and benzodiazepines, generally, "that have impacted her mood, affect, cognition, and memory."[8] (*Id.*)  In support, he cited Lane's ten-year treatment history of numerous benzodiazepines and sedative-hypnotics and her admission that she drank heavily while taking these medications, because such medications are addictive in nature when cross-tolerant with alcohol.  (*Id.* at 30–31.)  In addition, Dr. Saathoff concluded that the "combination of sedative hypnotics such as benzodiazepines and alcohol impairs the formation of memory to a significant extent," which can include side-effects of amnesia, and that Lane's "use of alcohol and the benzodiazepine Xanax during [the Flight] may account for her inability to recall and/or development of starkly different assault scenarios."[9] (*Id.* at 31, 33.)  He

---

[7]  Dr. Saathoff does not explicitly conclude that Lane suffers from depression but does recount Lane's medical history indicating depression and explains that depression is a side-effect of Zyprexa, a drug prescribed to and taken by Lane.  (*See, e.g.*, Saathoff Rep. 12 (explaining that "[t]earfulness, anxiety, depression, and panic attacks were noted" during one of Lane's 2016 medical visits); *id.* at 23 (observing that Lane showed "no signs of stress, anxiety, depression, or irritability" during Dr. Saathoff's mental state examination); *id.* at 29 (explaining that Lane's self-described fogginess may result from the "moderate adverse effects of Zyprexa," which include confusion, amnesia, and depression).)

[8]  Dr. Saathoff separately concluded that "[t]here is significant evidence that Ms. Lane has experienced significant mood symptoms over time as well as anxiety," although "[i]t is difficult to know to what extent her ████████████ . . . has been a factor in the emergence of these symptoms."  (Saathoff Rep. 36.)

[9]  It is unclear whether Dr. Saathoff credits Lane's serious head injuries as a cause of her inconsistent memory.  (*Compare* Saathoff Rep. 33 (concluding that Lane's "significant memory

also cited Lane's ████████████ without psychiatric supervision as support for his

conclusions regarding her ████████████ and memory issues.  (*Id.* at 30; *see also id.* at 32

(concluding that Lane's significant memory problems are driven, in part, by ████████████

████████████).)  Dr. Saathoff ultimately concluded that Lane's ████████████

████████████ has been a driver for both self-harm and violence towards others, not to mention

absenteeism from work, marital stress, and impulsive/reckless behavior" and that her "████████

████████████ history with co-existent mood and anxiety symptoms" preceded the Flight.  (*Id.*

at 36.)

Dr. Saathoff further concluded that Lane's "current level of function is high relative to

the period prior to the alleged sexual assault on the [Flight]."  (*Id.* at 32.)  In support, he cited

Lane's "positive response to dialectical behavior therapy and abstinence from alcohol and

sedative-hypnotic medications," as well as her "ambitious plans for her and her husband," all of

which "place her in a position that is improved in some ways compared to her level of

functioning prior to the [Flight]."  (*Id.* at 32–33, 35, 36.)  He further concluded that "[t]he anger,

anxiety, dissociation, depression, panic attacks, and fear that Ms. Lane is said to experience as

listed by Dr. Vanino were not evident based upon her descriptions . . . of her current life."  (*Id.* at

35.)

Finally, Dr. Saathoff concluded that Lane has taken on "the patient role" or "victim

narrative" and is exaggerating her experiences or "perceptions of experiences."  (*Id.* at 34.)  In

support, he cited to Lane's "own acknowledgement of her tendency to exaggerate," her

---

problems are driven by multiple serious head injuries, many years of ████████████

████, ████████████, and current ████████ *with id.* at 36 (noting that

although Lane "attributes much of her memory difficulties on traumatic brain injuries, this was

not a diagnostic consideration based upon the results of her testing").)

psychological testing, "which demonstrates exaggeration," and documentation from Wings

Recovery Treatment Center ("Wings") that noted Lane was "very fused with her victim

narrative" and "bec[ame] increasingly frustrated when those distortions [were] challenged." (*Id.*

at 34, 36.)  He concluded that "[h]er self-described ability to exaggerate . . . and willingness to

manipulate those close to her, are personality features that preceded the [Flight]." (*Id.* at 36.)

### 2. The Court excludes in part and admits in part Saathoff's expert opinion

Plaintiffs argue that portions of Dr. Saathoff's expert report and proffered testimony

should be excluded as unreliable or unhelpful.[10]

Defendant argues that Dr. Saathoff's "opinions are based on reliable methodologies

which consider the entirety of the pertinent facts of this case" and "will assist the trier of fact to

determine the issue of damages, an essential element of Plaintiffs' negligence claim." (Def.'s

Opp'n 19.)

### A. Reliability

Plaintiffs argue that Dr. Saathoff's opinions are unreliable because he (1) "uses data

found invalid" by Dr. Rodd to conclude that Lane suffered from ███████████████████,

(Pls.' Mem. 10–11; Pls.' Reply 9–10); (2) references an outdated and unsupportive source and

ignores "more recent and relevant research from JAMA Psychiatry" to reach his conclusion that

dialectical behavior therapy "is designed specifically for individuals who suffer from ████████

███████████," (Pls.' Mem. 11–13); (3) makes a conclusion outside the scope of his

expertise, *i.e.*, that there are "nine alleged practitioners available to treat [Lane]" in her

hometown, (*id.* at 13; Pls.' Reply 10); (4) ignores facts, such as that Lane "was treated by Wings'

---

[10]  Although Plaintiffs do not specifically classify their challenges to Dr. Saathoff's opinions as ones of reliability and helpfulness, the Court understands them as such and groups them accordingly.

medical doctor, psychiatrist, psychologist, and other mental healthcare professionals who understood [her] psychopharmacology needs," (Pls.' Mem. 13–14; Pls.' Reply 10); (5) reaches the conflicting conclusions that Lane is receiving "unnecessary ███████ yet has a current level of high functioning, (Pls.' Mem. 15); (6) uses a questionable methodology of conducting lengthy interviews over video rather than in person without providing the limitations of such an examination as required by the *Ethics Guidelines for the Practice of Forensic Psychiatry* and fails to acknowledge that "people's responses very often change when they know (or believe) that an interview is being observed or recorded," (*id.* at 18–20; Pls.' Reply 9); and (7) does "not provide a differential diagnosis" nor does he "attempt to differentiate the [twenty-nine] diagnos[e]s Lane's [twenty-five] treating physicians found," (Pls.' Reply 7).

Defendant argues that Dr. Saathoff's report "seeks to opine upon the *specific causation* of [Lane]'s mental conditions and disorders" and "is not only based upon a proper differential diagnosis" but is also bolstered by citation to "relevant psychological literature, medical records, interviews with, and evaluations of [Lane]." (Def.'s Opp'n 24, 26.)  In support, Defendant argues that Dr. Saathoff's report considered Lane's "medical, psychological, and psychiatric records from treatment that she received both *before and after* the alleged incident on the Flight" as well as her "own admissions during the collection of interviews conducted during the course of this litigation, which are permissible and reliable bases for an expert to rely upon to support a theory of causation." (*Id.* at 26–28.)  In addition, Defendant argues that Plaintiffs "fail to cite any legal authority or pages from the *Ethics Guidelines for the Practice of Forensic Psychiatry* to support their contention that remote psychiatric evaluations are somehow less reliable than in-person evaluations" and that they ignore "excerpts from Dr. Saathoff's report detailing his physical observation of Plaintiff's appearance and body language during their interview." (*Id.* at

28–29 (citation omitted).)  Defendant further argues that "Plaintiffs' attempts to support the argument that there is an analytical gap between the pertinent facts of this case and Dr. Saathoff's conclusions are either mischaracterizations of his report which fail to consider the totality of his analysis or complete fabrications unsupported by any evidence." (*Id.* at 29.)

Dr. Saathoff's diagnoses that Lane suffers from ███████████████████, ████████████ and ████████████ are reliable.  Similar to the opinions of Dr. Rodd, Dr. Saathoff's opinions are based on conventional methods for rending a psychiatric diagnosis, including a review of Lane's medical records and his six-hour examination of Lane.  *See Weiss*, 2019 WL 6174350, at *2; *Tardif*, 344 F. Supp. 3d at 600; *O'Loughlin*, 2016 WL 5416513, at *4–5; *Tchatat*, 315 F.R.D. at 445–46; *Schoolcraft*, 2015 WL 6444620, at *2.  Although he did not conduct any independent psychological tests, he relied on tests administered by other experts, including Dr. Rodd and Dr. Vanino, as well as Lane's previous physician, Dr. Duclos.  (Saathoff Rep. 1, 25–27.)  Dr. Saathoff then applied criteria from the DSM-V to his own observations of Lane to diagnose her with ████████████████.  (*Id.* at 28 ("A review of [Plaintiff's] history and my interview is notable for features that reflect ███████████████████.").)  He also relied on scientific literature and his knowledge as a psychiatrist to conclude that Lane is experiencing ██████████ and suffers from ████████████.  (*Id.* at 29–31); *see, e.g.*, *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000); *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003).  Accordingly, because Dr. Saathoff used reliable methodology to conclude that Lane suffers from ██████████████████, ████████████ and ████████████, he may testify to those conclusions.

However, the Court finds that there is "too great an analytical gap between the data and the opinion proffered" to admit Dr. Saathoff's diagnoses of Lane as suffering from PTSD,

antisocial personality features, and "the patient role" or "victim narrative" or his proposed

testimony regarding causation or exacerbation.  *Nimely*, 414 F.3d at 396 (quoting *Gen. Elec.*, 522

U.S. at 146).  Dr. Saathoff does not use any methodology to independently reach Lane's

diagnoses of PTSD, antisocial personality features, or her "patient role" but rather relies on the

conclusions of other experts and Lane's own statements to reach his diagnoses.  (*See* Saathoff

Rep. 34 (concluding that Lane places herself in "the patient role" because "her psychological

testing [conducted by other experts] demonstrates exaggeration" and "is complemented by her

own acknowledgement of her tendency to exaggerate" without citation to the DSM-V, scientific

literature, or psychiatric knowledge gained during his career to support his conclusion); *id.* at 36

(concluding that Lane's "traumatic narrative as expressed to me provides for me a perspective

shared in the documentation from Wings" that Lane is "very fused with her victim narrative");

*id.* (concluding that Lane's testing "is consistent with diagnoses of [PTSD]" without further

explanation or analysis); *id.* (concluding that Lane's "psychological testing and history reflect

. . . Antisocial Personality features" without further explanation or analysis)); *see, e.g.*, *Matthews

v. Hewlett-Packard Co.*, No. 15-CV-3922, 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017)

(precluding the testimony of a psychologist whose "opinion on causation appears to be based on

little more than [the p]laintiff's *own* opinion on this issue, without the benefit of any additional

or independent analysis" and thus his opinion on causation "simply does not reflect a

methodology reliant upon [the expert]'s specialized knowledge or experience, and thus, cannot

be considered reliable" (citations omitted)); *Hernandez v. Leichliter*, No. 14-CV-5500, 2016 WL

684038, at *2 (S.D.N.Y. Feb. 18, 2016) ("To the extent [the expert] merely repeats or recasts the

testimony of [the p]laintiff in order to arrive at a theory of causation, he is not testifying as an

expert witness based upon specialized knowledge, but rather is acting as a conduit for another

witness's testimony in the guise of an expert's opinion."); *Valentin v. New York City*, No. 94-CV-3911, 1997 WL 33323099, at *27 (E.D.N.Y. Sept. 9, 1997) ("An expert cannot act as a mere conduit for the opinions of other persons.").

In addition, similar to Dr. Rodd, Dr. Saathoff concluded that "the alleged sexual assault, if it actually occurred, had the potential to exacerbate Ms. Lane's longstanding PTSD," but not her other diagnoses which were "pre-existing." (Saathoff Rep. 36.) Dr. Saathoff does not explain why the sexual assault could exacerbate one existing medical condition without exacerbating others.[11] In addition, Dr. Saathoff provides no opinion on the overall impact of the incident, taking into consideration Lane's positive steps in treatment, despite concluding that Lane is "in a position that is improved in some ways compared to her level of functioning prior to the [Flight]." (*Id.*) Accordingly, the Court finds that Dr. Saathoff's report and proffered testimony regarding causation or exacerbation "lack[s] reliable foundation because he provided no explanation as to how his opinion was based on his experience or medical education," *Vale*, 673 F. App'x at 116, and "is connected to existing data only by the *ipse dixit* of the expert," *Nimely*, 414 F.3d at 396 (quoting *Gen. Elec.*, 522 U.S. at 146).

---

[11]  Although Defendant argues that Dr. Saathoff concluded that "the alleged assault, if it occurred, 'had the potential to exacerbate' Plaintiff's pre-existing mental disorders," (Def.'s Opp'n 32), Dr. Saathoff concluded that:

> [T]he alleged sexual assault, if it actually occurred, had the potential to exacerbate Ms. Lane's longstanding PTSD. The ▇▇▇▇▇ and features outlined above were pre-existing, as were her ▇▇▇▇▇ with co-existent mood and anxiety symptoms. Her positive response to dialectical behavior therapy and abstinence from alcohol and sedative-hypnotic medications place her in a position that is improved in some ways compared to her level of functioning prior to the American Airlines flight in question.

(Saathoff Rep. 36.) Dr. Saathoff does not conclude that the incident had the potential to exacerbate all of Lane's preexisting mental disorders, only PTSD. (*Id.*)

Because Dr. Saathoff's "expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero*, 424 F.3d at 253 (quoting *Amorgianos*, 303 F.3d at 266).  Accordingly, the Court excludes Dr. Saathoff's expert opinion concerning his diagnoses that Lane suffers from PTSD, antisocial personality features, and "the patient role" or "victim narrative" and his proposed testimony concerning the causation or exacerbation of Lane's medical conditions.

The Court therefore (1) admits Dr. Saathoff's expert opinion concerning his diagnoses that Lane suffers from ███████████████, ██████████ and ████████████, (Saathoff Rep. 27–33); (2) excludes Dr. Saathoff's expert opinion concerning his diagnoses that Lane suffers from PTSD, antisocial personality features, and "the patient role" or "victim narrative," (*id.* at 27–28, 31, 36); and (3) excludes Dr. Saathoff's expert opinion concerning his proposed testimony regarding causation or exacerbation, (*id.* at 32–33, 35, 36).

## B.    Helpfulness

Plaintiffs argue that Dr. Saathoff's opinions would be unhelpful to the jury because he (1) invades the province of the jury by opining on "memory, perception, and the fallibility of human recall," (Pls.' Mem. 15); and (2) merely "highlight[s] jury arguments" without providing an opinion, (*id.* at 15–18).  In support, Plaintiffs argue that Dr. Saathoff "simply seeks to testify as to what [Lane] said and to aid [D]efendant's counsel in highlighting jury arguments" and "[h]is 'opinions' are simply unpermitted voices for factual narratives about the case."  (*Id.* at 18.)  Specifically, Plaintiffs object to Dr. Saathoff's conclusions that Lane (1) has made "significant improvement" because of her "dedication to outpatient therapy groups and abstinence from sedative hypnotics and alcohol"; (2) has "self-acknowledged significant memory problems"; and

(3) is a victim because her "perceptions of experiences over her life are significant for the degree of victimization she feels that she has experienced." (*Id.* at 17 (quoting Saathoff Rep. 33–34).)

Defendant argues that Dr. Saathoff's opinions would be helpful and would assist the trier of fact in determining the relevant issue of damages. (Def.'s Opp'n 31.)  In support, Defendant argues that one of the critical issues Dr. Saathoff is being proffered to testify about is the "extent of damages that [Lane] has suffered as a result of the alleged incident on the Flight," which he "directly address[ed] . . . in his conclusion that the alleged assault, if it occurred, 'had the potential to exacerbate' [Lane]'s pre-existing mental disorders."[12]  (*Id.* at 31–32 (citations omitted).)  Defendant further argues that Plaintiffs' argument that Dr. Saathoff's testimony "merely amounts to a factual narrative about the case, which was created to reject Dr. Vanino's findings in her expert report[,] . . . does not demonstrate that Dr. Saathoff's testimony would be unhelpful to a jury." (*Id.* at 32.)

The Court excludes Dr. Saathoff's proffered testimony regarding Lane's factual narrative as unhelpful to the trier of fact to the extent that Dr. Saathoff did not conduct additional or independent analysis.  Dr. Saathoff has no personal knowledge of the underlying facts, such recitation is not based on his expert knowledge or experience, and Defendant has not shown that Lane's personal history and medical records cannot be understood by a layperson. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) ("[E]xpert testimony must 'be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson.'" (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005))); *Tardif*, 344 F. Supp. 3d at 602–03 ("The [c]ourt has no reason to assume, and [the plaintiff] does not provide a

---

[12]  As discussed above in footnote 11, Dr. Saathoff concluded that the "alleged sexual assault, if it actually occurred, had the potential to exacerbate Ms. Lane's longstanding PTSD," (Saathoff Rep. 36), not all of Lane's preexisting mental disorders.

reason, that [the plaintiff]'s personal history and medical records cannot be understood by a lay

juror. . . . Because factual narrative from an expert is unnecessary, and [the expert] has no

personal knowledge of the underlying facts, [the expert] may not offer testimony [reciting the

plaintiff's own narration of her personal history] contained in pages 2–5 of his report." (citations

omitted)); *Island Intell. Prop.*, 2012 WL 526722, at *2 ("An expert may offer opinions that will

help the jury understand the evidence or determine factual issues.  He may not, however, directly

transmit facts to the jury, about which he has no personal knowledge, simply because his

testimony represents the easiest way to do that."); *Highland Cap. Mgmt., L.P. v. Schneider*, 379

F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) (explaining that an expert may not "simply rehash[]

otherwise admissible evidence about which he has no personal knowledge," and "[w]hile an

expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be

presented to the jury solely for the purpose of constructing a factual narrative based upon record

evidence" (citing Fed. R. Evid. 703)); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551

(S.D.N.Y. 2004) (precluding expert testimony that consisted of a "narrative of the case which a

juror is equally capable of constructing" (quoting *Taylor v. Evans*, No. 94-CV-8425, 1997 WL

154010, at *2 (S.D.N.Y. Apr. 1, 1997))).  Accordingly, the Court excludes Dr. Saathoff's expert

opinion regarding Lane's factual narrative to the extent that Dr. Saathoff did not conduct

additional or independent analysis.[13]  (*See, e.g.*, Saathoff Rep. 34 (concluding that Lane places

herself in "the patient role" because "her psychological testing [conducted by other experts]

---

[13]  As Defendant concedes, Dr. Saathoff's opinion and proffered testimony regarding the
number of psychiatrists in Durango "is not the type of specialized knowledge that would be
subject to the admissibility standards of Rule 702 and *Daubert*," (Def.'s Opp'n 22 n.7), and thus
should not be offered through Dr. Saathoff as an expert witness, *see, e.g.*, *Serrano v. City of New
York*, No. 15-CV-6885, 2022 WL 2529547, at *4 (S.D.N.Y. July 7, 2022) ("The testimony must
not be 'directed solely to lay matters which a jury is capable of understanding and deciding
without the expert's help.'" (quoting *Tardif*, 344 F. Supp. 3d at 596)).

demonstrates exaggeration" and "is complemented by her own acknowledgement of her tendency to exaggerate" without citation to the DSM-V, scientific literature, or psychiatric knowledge gained during his career to support his conclusion).)

The Court is not persuaded, however, by Plaintiffs' argument that Dr. Saathoff's opinions as to Lane's potential memory issues "invad[es the] province of [the] jury." (Pls.' Mem. 15.) Dr. Saathoff gave a reasoned opinion on how a medication prescribed to Lane, when mixed with alcohol, could affect her memory. (*See* Saathoff Rep. 31 ("Lane acknowledged to me that she was drinking heavily during the same period that she was taking benzodiazepines. This combination of sedative hypnotics such as benzodiazepines and alcohol impairs the formation of memory to a significant extent."); *id.* at 33 ("Lane's use of alcohol and the benzodiazepine Xanax during [the Flight] may account for her inability to recall and/or development of starkly different assault scenarios.").) Dr. Saathoff did not opine on the state of mind or credibility of Lane, which would be inadmissible, even "when such evaluations are rooted in scientific or technical expertise." *Nimley*, 414 F.3d at 398 (first citing *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); and then citing *United States v. Scop*, 846 F.2d 135, 142–43 (2d Cir. 1988)); *Island Intell. Prop.*, 2012 WL 526722, at *2 ("No proposed expert will be allowed to opine on the state of mind or intent of a particular individual. This invades the province of the jury members, who are tasked with determining facts and credibility." (first citing *In re Blech Sec. Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *21–22 (S.D.N.Y. Mar. 26, 2003); and then citing *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187–88 (S.D.N.Y. 2008))). Accordingly, the Court admits Dr. Saathoff's expert opinion regarding the side effects of Lane's prescribed medications and how those medications could affect Lane, such as impairing her memory. (*See, e.g.*, Saathoff Rep. 31, 33.)

The Court therefore (1) excludes Dr. Saathoff's expert opinion regarding Lane's factual narrative to the extent that Dr. Saathoff did not conduct additional or independent analysis, (*see, e.g.*, Saathoff Rep. 34 (conclusions regarding exaggeration)); and (2) admits Dr. Saathoff's expert opinion regarding the side effects of Lane's prescribed medications and how those medications could affect Lane, (*id.* at 31, 33).

### iii.   Defendant's motion to exclude Kim E. Petersen's opinion

Defendant moves to exclude the expert opinion of Plaintiffs' "Transportation Security Expert," Kim E. Petersen.  (Def.'s Mem. 4–7, 13–23; *see also* Petersen Rep.)

### 1.   Petersen's background and expert opinion

Petersen is a "multi-modal transportation security specialist" employed as President of Security Dynamics LLC.  (Petersen Rep. 1.)  He has over forty years of "combined experience in maritime security, special operations, national security, and intelligence operations," having "specialized in transportation security" since 1995.  (*Id.* at 1, 27.)  His experience includes developing "security standards and practices for aviation, rail, cruise, and maritime operations." (*Id.* at 1.)  He has served as director of security for former Secretary of State, Alexander M. Haig, and as chief of security operations for the Presidential Transition for President George H.W. Bush.  (*Id.* at 28–29.)  Starting in 1995, he worked with various cruise companies developing "global security and counterterrorism program[s]," eventually being elected as executive director of the Maritime Security Council, holding that position for nine years until 2006.  (*Id.* at 29.)  During this time, he also taught counterterrorism and transportation security to "the US Navy, [US Coast Guard], Army, FBI, foreign law enforcement and intelligence services, and numerous state and local police departments and transportation authorities."  (*Id.*)  He is currently the president of Security Dynamics LLC, a company he founded.  (*Id.* at 1, 27–28.)

32

Plaintiffs asked Petersen to present his opinion on "aviation security practices" and on "security measures and actions relating to" the present case. (*Id.* at 1.)  In particular, Plaintiffs asked him to determine "whether passenger terminal staff, cabin crew, and officers of [the Flight] followed [Defendant]'s preventive security policies established to detect and deter intoxicated passengers from boarding their aircraft or being served alcoholic beverages while onboard"; "if the measures employed by [the Flight]'s aircraft crew were in compliance with applicable company policies and the passenger aviation transportation industry's best practices"; and "if [Defendant] provided a safe and secure environment for its passengers during [Lane's] flight." (*Id.* at 4–5.)  In preparing his report, Petersen reviewed numerous regulatory documents, including federal regulations concerning flight crew training and alcoholic beverages to be served on flights, along with various other transportation security acts and guidance documents. (*Id.* at 7–9.)  He also reviewed all case documents available to him, including the parties' moving papers, deposition transcripts, and exhibits. (*Id.*)  These exhibits included Defendant's own policy and guidance documents. (*Id.*)  Most of Petersen's report consists of summaries of various witnesses' deposition testimony, including that of Lane, a neighboring passenger, and a retired pilot who was also a passenger on the Flight. (*See id.* at 15–23.)  These summaries are interspersed with Petersen's views, described below, regarding whether the Flight crew appropriately responded to Santiago and the complaints received during the Flight.

In his report, Petersen opined that the Flight crew failed to comply both with federal regulations and industry best practices, citing, *inter alia*, 14 C.F.R. § 121.575(c), which prohibits the boarding of "any person . . . if that person appears to be intoxicated." (*See id.* at 9–10.) Based on his review of the deposition transcripts, Petersen concluded that the "[F]light crew failed to effectively screen and deter Mr. Rene Santiago, who was immediately recognized as

seriously inebriated by several passengers," and that this failure was "due to a lack of training." (*Id.* at 10.)  He wrote that "[i]n the absence of such training, [Defendant] could have posted the [International Air Transport Association ("IATA")] chart in crew lounges and aircraft to assist [flight attendants] in identifying the warning signs of inebriation but chose not to." (*Id.*) Petersen highlighted that the IATA's "Traffic Light System" chart warns that people who are "[g]lassy-eyed, walking awkwardly, stumbling or falling down and spilling drinks" likely "had too much to drink" and are possibly intoxicated. (*Id.* at 13.)  He also recounted the testimony of other passengers — including that of the passenger seated next to Santiago, two seats away from Lane — and comments that their observations reflect that Santiago's inebriation was "immediately apparent," meaning that the Flight crew "either failed to scrutinize Mr. Santiago or elected to ignore his stumbling and smell of alcohol." (*Id.* at 10–12.)  Petersen's view is that based on the depositions and available case documents, Defendant "does not have a company policy on preventing sexual assault onboard their passenger aircraft," based on the crew's inability to recall any training or guidance. (*Id.* at 15 (emphasis omitted).)  Petersen suggested that this lack of training and refusal to screen passengers could be linked to "increased pressure placed upon flight crews to decrease late departures" because of "the US Department of Transportation's decision to publicize and rank airlines by their late arrivals." (*Id.* at 14.)  He reported that "screening passengers for inebriation is viewed by the flight crew as risky," as it could lead to lawsuits, disciplinary action, and further delays in flight departures. (*Id.*)

Petersen also faulted the Flight crew for failing to respond appropriately to complaints that were made during the Flight.  He pointed to a flight attendant's testimony that Lane had complained that Santiago was sexually harassing her. (*Id.* at 17.)  Petersen explained that "one of the fundamental employee requirements taught in transportation security and safety classes" is

that "once such an allegation has been made to an official representative of the carrier . . . that representative has the obligation to report the incident through their chain-of-command." (*Id.* at 17–18.)  Basing his view on the American Airlines Customer Incident Guide, Petersen reported that the crew should have filed a "Passenger In-Flight Disturbance Report (PIDR)" against Santiago upon receiving the complaint, and further should have interviewed both Lane and Santiago, "ensur[ing] that they were separated and kept under observation throughout the flight, and report[ing] the incident by radio to law enforcement at the arrival airport." (*Id.*)

Finally, Petersen explained that it is "recognized within the transportation industry that the majority of sexual assaults will occur at night when visibility and activities on an aircraft . . . are reduced," yet the Flight crew failed to conduct regular walkthroughs. (*Id.* at 18–19.)  In Petersen's opinion, "had the crew of [the Flight] recognized that Mr. Santiago represented a potential problem, they would have directed the crew to focus on him during their walkthroughs, . . . recogniz[ing] that Ms. Lane was being physically and sexually harassed by an inebriated passenger and at risk." (*Id.* at 19.)  In Petersen's view, this error was further compounded by the Flight crew's failure to station crew members "in the rear of the aircraft" where the assault allegedly occurred. (*Id.* at 18–19.)  He opined that if crew members were "at the aft station on the aircraft during the night, Mr. Santiago would not have been able to break in to Ms. Lane's lavatory and rape her without such act being witnessed by a crew member." (*Id.* at 19–20.)

## 2. The Court excludes in part and admits in part Petersen's expert opinion

Defendant argues that the Court should exclude Petersen's opinion because he is not qualified "to opine on very specific issues addressing [Defendant]'s compliance with federal regulations and industry standards," and "because all of the opinions expressed in his [r]eport are either impermissible legal conclusions or his own unsupported interpretations of evidence

35

already available to the jury." (Def.'s Mem. 15–16.)

Plaintiffs argue that Petersen's experience sufficiently qualifies him to provide his opinion, and that his statement of facts simply lays a foundation to support his opinion. (Pls.' Opp'n 3, 17–18.)

### A.   Qualifications

Defendant first argues that though Petersen has "generalized experience in transportation security," he is "not qualified to opine upon the very specific issues Plaintiffs have asked him to address." (Def.'s Mem. 15–16.)  In support, Defendant asserts that Petersen has no experience "regarding industry standards for the regulation of intoxicated boarding and service of alcohol on commercial airlines." (*Id.* at 17.)  Rather than having Petersen offer his opinion on these practices, Defendant argues, Plaintiffs should have sought the expertise of "pharmacologists, toxicologists, or some sort of dram shop and alcohol beverage regulation expert." (*Id.*)  Defendant further argues that Petersen's background "does not qualify him to provide expert testimony regarding industry standards for sexual assault prevention on commercial airlines." (*Id.* at 18–19.)  In support, Defendant faults Petersen for failing to show how "his purported expertise is related to the particular facts surrounding the alleged sexual assault in this case." (*Id.* at 18.)  Defendant asserts that the only relevant experience of his related to sexual assault prevention is an "e-Learning program" that Petersen allegedly authored, but that this program "is tailored towards maritime and military standards, not commercial aviation" and "is neither cited nor referenced anywhere in Petersen's Report." (*Id.* at 19.)

Plaintiffs respond that "Rule 702 does not demand that a witness's expertise be perfectly tailored to the facts of the case." (Pls.' Opp'n 16.)  They argue that Petersen need not be an "expert . . . formally educated in the relevant subject matter" when he has "gained specialized

36

knowledge through experience or training," and that this "'experience alone — or experience in conjunction with other knowledge, skill, training, or education' is sufficient to qualify Mr. Petersen as an expert." (*Id.* at 3 (quoting Fed. R. Evid. 702 advisory committee's notes).) Any disputes regarding Petersen's methodology or basis for his opinion, Plaintiffs contend, "go to the weight, not the admissibility, of his testimony." (*Id.* at 16 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).) Plaintiffs next point to the fact that in the face of rising concerns over sexual assaults in commercial flights, Congress established a task force to advise the Secretary of Transportation on best practices for air carriers. (*Id.* at 11–12.) Plaintiffs highlight as particularly relevant that when the task force learned that most airlines "do not train their employees specifically on handling incidents of sexual misconduct," it "looked at training practices in the cruise and hotel and restaurant industries as part of its discussion on airline training programs to address in-flight sexual misconduct." (*Id.* at 12 (internal quotation marks, emphasis, and footnote omitted).) Plaintiffs argue that "[i]t is hard to imagine witness availability from airline industry experts concerning prevention of airborne sexual assaults, when Congress could not find one and instead referred to those experts in the cruise industry, such as Mr. Petersen." (*Id.* at 17.) Similarly, Plaintiffs argue that when Defendant's own "designee on in-flight drink service, drink counts, the appearance of persons who appear to be intoxicated, or identifying intoxication could not identify their supposed Subject Matter Experts," Defendant cannot argue that Petersen is unqualified to testify as an expert. (*Id.*) Plaintiffs argue that to allow Defendant to exclude Petersen while failing to identify its own expert on the matter would amount to "letting [the airline] industry indirectly set its own standards." (*Id.* (quoting *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997)).)

In some cases, "a district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient." *Stagl*, 117 F.3d at 81; *see also Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328–29 (S.D.N.Y. 2022) (quoting the same). However, even if a proposed expert lacks such specific training or experience, "he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig*, 589 F. Supp. 3d at 328 (citing *McCullock*, 61 F.3d at 1043). In such cases, the court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl*, 117 F.3d at 80). "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'" *Zyprexa Prods.*, 489 F. Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

The Court is not persuaded by Defendant's argument that Petersen's "general expertise as a transportation security expert," (Def.'s Mem. 16), makes him unqualified to opine on whether the crew of the Flight followed Defendant's "preventive security policies," whether they "were in compliance with . . . the passenger aviation transportation industry's best practices," or whether Defendant "provided a safe and secure environment for its passengers during the Plaintiff's flight," (Petersen Rep. 4–5). Defendant attempts to contrast Petersen's background

38

with that needed to testify on "industry standards for the regulation of intoxicated boarding and service of alcohol on commercial airlines" or on "industry standards for sexual assault prevention on commercial airlines." (Def.'s Mem. 17–18.)  Not only is this an overly narrow interpretation of the subject matter of Petersen's report, but an expert need not specialize in these specific topics to provide helpful context on prevailing safety practices in the transportation industry or to comment on whether employees properly complied with company policies. "[W]here an expert possesses qualifications in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011)).  Petersen's background includes experience advising on security matters for cruise lines and shipping companies, and on transportation security for law enforcement.  (Petersen Rep. 28–29.)  As part of his work developing safety protocols for Princess Cruises, he participated in developing "comprehensive programs" to address "sexual assaults onboard cruise ships" and "other issues of criminality onboard the vessels." (Dep. of Kim E. Petersen 212:12–24, annexed to Pls.' Mem. as Ex. 1, Docket Entry No. 91-1.)  He worked with other subject matter experts and conducted "extensive research" to develop the training program that was ultimately "duplicated by other cruise lines" to address sexual assault and sexual harassment onboard the cruise ships.  (*Id.* at 214:2–215:24.)  Even if Petersen did not undergo a formal training himself, his "background and practical experience qualify as 'specialized knowledge'" that supports admission of his testimony under *Daubert*.  *See McCullock*, 61 F.3d at 1043 (admitting an expert's testimony on "fume dispersal" based on his "practical experience," despite his lack of "academic training").  To the extent Defendant

believes Petersen's practical experience weakens his opinion, that experience can "properly [be] explored on cross-examination" and go to his testimony's "weight and credibility — not its admissibility." *Id.* (citing *Fernandez v. Chios Shipping Co.*, 542 F.2d 145 (2d Cir. 1976)).

### B. Impermissible legal conclusions and interpretation of the evidence

Defendant also argues that Petersen's proffered testimony consists of either "impermissible legal conclusions or nothing more than Petersen's own interpretations of regulatory and discovery documents in this case, unsupported by and unconnected to any of his purported expertise." (Def.'s Mem. 19–23.) In particular, Defendant faults as a legal conclusion Petersen's opinion that the crew of the Flight "failed to comply with federal regulations." (*Id.* at 20.) Defendant also points to Petersen's conclusions "regarding [Defendant]'s alleged failure to meet industry standards" as insufficiently supported by his purported expertise. (*Id.* at 20–21.) These "baseless conclusions," Defendant argues, "cannot withstand the reliability standard of Rule 702." (*Id.* at 20.) Defendant further argues that the Court should not admit expert testimony that is based "upon the interpretation of discovery evidence (such as regulatory documents) already available to the factfinder and not upon the expert's own proffered expertise." (*Id.* at 21–22.) Defendant asserts that Petersen also cannot base his conclusions on "his review of various deposition transcripts" for this same reason. (*Id.*) Finally, Defendant points to other cases in which courts have excluded Petersen's testimony "where his opinion was either based on nothing more than his interpretation of evidence already available to the trier of fact or ultimately unhelpful to the jury in determining issues relevant to litigation, just like he attempts here." (*Id.* at 22.)

Plaintiffs argue that "[i]t is premature for [Defendant] to seek to prevent Mr. Petersen from stating facts he set forth in his [r]eport laying a foundation to support his opinions and/or

his interpretation of the facts." (Pls.' Opp'n 17.) Plaintiffs outline numerous parts of Petersen's report and argue that the highlighted excerpts rely on "his experience, the [Federal Aviation Administration] Report, and review of the evidence in this case." (*Id.* at 19–22.) Accordingly, they argue that Petersen's opinions should be presented to a jury "to decide the weight to which his opinions are entitled." (*Id.* at 22.)

The Court excludes any portion of Petersen's report and testimony that expresses a legal conclusion — specifically, Petersen's opinion that Defendant's staff "failed to comply with Title 14 Code of Federal Regulation, Section 121.575(c)" is inadmissible. (Petersen Rep. 10.) Regardless of underlying expertise, "experts may not testify as to conclusions of law," because "[d]oing so would usurp the role of the court in determining the applicable legal standards." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (first citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); and then citing *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

However, the Court is not persuaded by Defendant's contention that Petersen's opinions as to "industry standards" must be excluded. (Def.'s Mem. 20–21.) Although Defendant argues that these opinions are "entirely unsupported" and "cite to 'common sense' as a basis," (*id.*), Petersen's report reflects that he relied on the IATA's Traffic Light System, its "Guidance on the Safe Service of Alcohol on Board," Petersen's own experience from trainings given to federal law enforcement, and his review of Defendant's own policy documents, (Petersen Rep. 10, 11 n.15, 13 & n.19, 17). For example, Petersen explains that the IATA "Traffic Light System" chart is meant to guide crew members on "how to evaluate a person's possible intoxication so as to determine their relative risk during the flight," and that the chart flags as potentially disruptive to flight operations someone who is "[g]lassy-eyed, walking awkwardly, stumbling or falling down

41

and spilling drinks." (*Id.* at 13.)  Elsewhere, he relies on his experience in the industry to explain

that "there has been increased pressure placed upon flight crews to decrease late departures" ever

since "the US Department of Transportation's decision to publicize and rank airlines by their late

arrivals," and that "screening passengers for inebriation is viewed by the flight crew as risky" for

this reason.  (*Id.* at 14 (internal quotation marks omitted).)  Similarly admissible are Petersen's

opinions as to the proper response to a complaint of sexual harassment onboard a flight.  (*See id*.

at 17–18.)  Notwithstanding Defendant's arguments to the contrary, these bases for Petersen's

opinions on industry standards do not amount to the kinds of "serious flaws in reasoning or

methodology" that warrant exclusion.  *In re Fosamax*, 645 F. Supp. 2d at 173 (citing

*Amorgianos*, 303 F.3d at 267).  Petersen's views are "based on data — including personal

experience, interviews, review of . . . manuals and other primary sources . . . 'of a type

reasonably relied upon by experts in various disciplines of social science.'"  *Vazquez v. City of

New York*, No. 10-CV-6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (quoting *Katt v.

City of New York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001)); *see also Kumho Tire*, 526 U.S. at

148–49 (acknowledging that in some disciplines, the reliability inquiry may turn on the expert's

"knowledge and experience of his discipline" rather than on "scientific" or "technical"

knowledge (quoting *Daubert*, 509 U.S. at 592)).  Any perceived weaknesses in Petersen's

foundation for these opinions "are fair ground for cross-examination, but they are not a basis for

preclusion."  *Vazquez*, 2014 WL 4388497, at *12; *see also Daubert*, 509 U.S. at 596 ("Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Finally, the Court excludes those portions of Petersen's report that "construct a factual

narrative based upon record evidence."  *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95,

116 (E.D.N.Y. 2019).  "Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time.  These provisions afford ample assurances against the admission of opinions which would merely tell the jury what results to reach."  *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992).  An expert may not "simply rehash[] otherwise admissible evidence about which he has no personal knowledge," and "[w]hile an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."  *Highland Cap.*, 379 F. Supp. 2d at 468–69 (citing Fed. R. Evid. 703); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (excluding portions of an expert opinion that presented "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence").  *But see B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-CV-2738, 2021 WL 234550, at *13 (E.D.N.Y. Jan. 19, 2021) (admitting an expert's narrative because it was not presented "for the purpose of drafting a facts section and speculating about [d]efendants' agents' state of mind and motivations, . . . but for the purpose of evaluating" the evidence in light of expert's expertise).  Moreover, the Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."  *Nimley*, 414 F.3d at 398 (first citing *Lumpkin*, 192 F.3d at 289; and then citing *Scop*, 846 F.2d at 142–43).

Extensive portions of Petersen's report simply "rehash[] otherwise admissible evidence," *Jensen*, 372 F. Supp. 3d at 116, seemingly for no other purpose than to "construct[] a factual narrative based upon record evidence," *Highland Cap.*, 379 F. Supp. 2d at 469.  Much of his report is spent summarizing the testimonies of Lane, various other passengers, and crew

members on the Flight.  (*See, e.g.*, Petersen Rep. 11–23.)  He effectively "tell[s] the jury what

results to reach," *Hygh*, 961 F.2d at 363, when he opines, for example, that "[i]t should have

been apparent to both the gate agents and the crew that Mr. Santiago was inebriated and unfit to

be boarded," (Petersen Rep. 11).  Similarly, Part 3 of his "Opinions" section consists of nothing

other than Petersen's own summary of the testimonies of Lane, the neighboring passenger, and

the passenger flight captain who observed the incident.  (*Id.* at 15–17.)  The Court excludes such

portions of Petersen's report that merely restate what could be presented to a jury "through

percipient witnesses and documentary evidence."  *See In re Rezulin*, 309 F. Supp. 2d at 551.

For the above reasons, the Court (1) excludes Petersen's opinion that Defendant's staff

"failed to comply with Title 14 Code of Federal Regulation, Section 121.575(c)," (Petersen Rep.

10); (2) admits Petersen's opinions as to "industry standards"; and (3) excludes those portions of

Petersen's report that would be "presented to the jury solely for the purpose of constructing a

factual narrative based upon record evidence," *Highland Cap.*, 379 F. Supp. 2d at 469 (citing

Fed. R. Evid. 703).

### iv.   Defendant's motion to exclude Dr. Sheri Vanino's opinion

Defendant moves to exclude Plaintiffs' psychology expert, clinical psychologist Dr. Sheri

Vanino.  (Def.'s Mem. 23–30; *see also* Vanino Rep.)

### 1.   Dr. Vanino's background and expert opinion

Dr. Vanino has "[seventeen] years of experience as a licensed clinical psychologist with

an expertise in sexual assault and [twenty-four] years in the mental health field, working directly

and indirectly with thousands of sexual assault survivors."  (Vanino Rep. 4.)  Her work has

"focused on trauma assessment and treatment," including work as clinical director of a rape

crisis center in Colorado, as a referral specialist at a hospital emergency department, in a

44

psychiatric inpatient rehabilitation center, as a forensic expert, and as an adjunct professor. (Decl. of Dr. Sheri Vanino ("Vanino Decl.") 21–22, annexed to Pls.' Opp'n as Ex. 6, Docket Entry No. 91-6.)  She regularly testifies in criminal cases, and has also provided trauma treatment instructions to "police agencies, the [Federal Bureau of Investigation], Planned Parenthood, and various district attorney's offices."  (*Id.* at 22.)

Plaintiffs retained Dr. Vanino "to address the psychological impact of the sexual assault that Ms. Lane endured at the hands of Rene Santiago when he sexually assaulted her." (Vanino Rep. 4.)  In preparing her report, Dr. Vanino conducted a psychological interview of Lane and had her complete five psychological tests, measuring "levels of 1) depression, 2) anxiety, 3) dissociative symptoms, and 4) trauma symptomology." (*Id.* at 6.)  She also conducted three follow-up interviews with Lane, and reviewed the depositions of Plaintiffs, the neighboring passenger, and the passenger flight captain.  (*Id.*)  In addition, Dr. Vanino reviewed numerous case documents and Lane's available health records, and she also conducted a phone interview with a trauma therapist who treated Lane after the alleged sexual assault.  (*See id.* at 5–6, 13.)

Dr. Vanino's report first reviewed Lane's childhood, including the trauma and abuse she suffered from her biological father as well as her babysitter's sons.  (*Id.* at 8.)  This background included details about the violent behavior of her first husband when she was twenty-one years old. (*Id.* at 9.)  Dr. Vanino then summarized the sexual assault Lane allegedly suffered onboard the Flight, as well as the treatment she sought out afterwards.  (*Id.* at 9–13.)

Dr. Vanino then proceeded to discuss the "[m]any myths [that] exist around the topic of sexual assault," including the "seemingly counterintuitive" behaviors that survivors of sexual assault exhibit during and after an assault.  (*Id.* at 13–20.)  She explained, for example, that "most victims of sexual assault do not fight back during an assault . . . due to the profound

confusion and terror they experience during a traumatic event." (*Id.* at 14.)  Similarly, Dr. Vanino explained that "[v]ictims of violence, sexual assault, or similar trauma may dissociate during the crime or continue to dissociate afterward." (*Id.* at 15–16.)  These same processes, she wrote, "also affect[] the victim's memory of the traumatic incident," leading to "severe memory deficits." (*Id.* at 16–17.)  She commented, for example, that it is "not at all bizarre that [Lane] does not recall whether she was exiting the bathroom when Mr. Santiago entered or whether she was actually sitting on the toilet." (*Id.* at 17.)  Finally, she explained that any "[d]elay in reporting" the incident was "not uncommon" among sexual assault victims. (*Id.* at 18–20.)

Dr. Vanino also detailed the effects of the alleged sexual assault on Lane's mental health in her report.  (*See id.* at 20–43.)  She first opined that "the assault has complicated and impacted every aspect of [Lane's] life, including her health, self-esteem, career, education, relationships, parenting abilities, marriage, intimacy, and trust in herself and the world." (*Id.* at 20.)  Dr. Vanino set forth the literature linking sexual assault and other nonsexual trauma to depression. (*Id.* at 20–21.)  She explained that "sexual assault victims have higher levels of depression and lower levels of self-esteem," and that "depression often becomes a lifetime diagnosis." (*Id.* at 20 (internal quotation marks omitted).)  She then outlined the numerous symptoms of depression that Lane continues to exhibit years after the alleged sexual assault. (*Id.* at 22–23.)  These symptoms include "daily crying spells, decreased sex drive, a mix of hypersomnia and insomnia, and constantly feeling sad and angry," as well as "low self-esteem, irrational guilt, shame, constant fatigue, and a lack of motivation." (*Id.* at 22.)  Dr. Vanino notes that "Lane has struggled on and off throughout her life with both depression and anxiety," and that she took antidepressants when she was in college, after she became pregnant, and later when she lost a pregnancy, as well. (*Id.*)  She writes that notwithstanding her earlier depression, Lane reports

that "since the rape, her depression and anxiety have intensified and often interrupt her daily functioning." (*Id.*) Although Dr. Vanino does not comment definitively on whether the alleged assault exacerbated Lane's depression, she does conclude that "Lane's medical records repeatedly document her intense struggles with depression since the rape." (*Id.* at 23.) Dr. Vanino further notes that the tests she conducted placed Lane between the 77th and 98th percentile in depression. (*Id.*)

Dr. Vanino then considered the extent to which the alleged assault affected and exacerbated Lane's anxiety. (*Id.* at 23–25.) She first reviewed the literature and highlighted that "[f]or many victims of sexual assault, anxiety typically becomes something they spend a lifetime attempting to manage." (*Id.* at 23.) Dr. Vanino then noted that "Lane has suffered from anxiety for most of her life, including social anxiety and perfectionism." (*Id.* at 24.) She acknowledged that Lane's preexisting anxiety was linked to fear "that her biological father would find her," but concluded that "since being raped by Mr. Santiago, the fear has not only returned but has become debilitating," detailing Lane's report that "she no longer trusts men and is fearful that she will be sexually assaulted again." (*Id.*) Dr. Vanino included several examples of Lane's behavior that reflect this fear, including "in seemingly innocuous situations." (*Id.*) This "generalized fear of men," Dr. Vanino explained, is common in "many victims of sexual assault." (*Id.*) She also explained that Lane's fear "underscores not only an inability to trust men but also a new concern that she cannot trust herself." (*Id.* at 25.) Dr. Vanino concluded that Lane's distrust in her own instincts "has an enormous crippling effect on everyday functioning and basic freedom to live life." (*Id.*) In addition, Dr. Vanino noted that Lane's "frequent panic attacks" since the alleged assault "are a debilitating form of anxiety" that occur "roughly once a week." (*Id.*) The tests

that Dr. Vanino conducted showed that Lane scored in the 95th to 99th percentile in anxiety, "indicat[ing] that Ms. Lane is struggling considerably with anxiety." (*Id.*)

Dr. Vanino then addressed Lane's PTSD diagnosis, opining that "it is apparent and reflected in her testing that Ms. Lane suffers from [PTSD]." (*Id.* at 26–33.) She summarized the various categories of PTSD to which Lane's symptoms are linked. (*Id.*) She first discussed how Lane is "reexperiencing," a phenomenon that occurs "when a victim of trauma continues to relive or replay a traumatic event." (*Id.* at 28–29.) Dr. Vanino detailed the various ways in which Lane "replays the assault in her mind," "go[ing] over and over her own behavior, thinking how she could have handled the situation differently." (*Id.* at 28.) Dr. Vanino listed the numerous "triggers that remind her of the sexual assault," and how these "triggers lead to nightmares, which result in disturbed sleep with even more exhaustion and depression." (*Id.* at 28–29.) Lane's PTSD also manifests through her "avoidance of trauma-related stimuli," meaning that she frequently has to distract herself with television or chores to avoid thinking about the assault, or avoids being alone with men. (*Id.* at 29–30.) Her PTSD leads to "negative cognition and mood," including "a persistent and distorted sense of blame of self or others, estrangement from others, markedly diminished interest in activities, or considerable and persistent negative emotions like depression, fear, anxiety, and anger." (*Id.* at 30.) Lastly, Dr. Vanino opined that Lane's trauma symptoms manifest as "trauma-related arousal of the nervous system." (*Id.* at 30.) In Lane's case, these symptoms include "difficulty concentrating," anxiety, hypervigilance, "difficulty calming her body," "heightened startle reactions," panic attacks, "occasional flashbacks," and "periods of extreme hypo and hypersomnolence." (*Id.*) Dr. Vanino observed, however, that "since the rape, . . . [Lane's] most challenging emotional struggle has been controlling her anger." (*Id.* at 31.) "Rage has hijacked Ms. Lane's mental stability and

48

overwhelmed most aspects of her life," Dr. Vanino wrote.  (*Id.*)  Since the alleged assault, Dr. Vanino reported that Lane "began getting so angry that she would scream, break dishes, and physically attack her husband, sometimes in front of her son."  (*Id.*)  This behavior led Lane to check herself into a "[seven]-week psychiatric treatment program to be treated for anxiety, PTSD, and angry outbursts."  (*Id.*)  Dr. Vanino concluded by noting that Lane's "testing results support a PTSD diagnosis," with the various tests placing her above the 80th percentile of numerous PTSD symptoms.  (*Id.* at 32–33.)

Dr. Vanino then discussed Lane's substance abuse, explaining that — consistent with the "substantial amount of research supporting the fact that many sexual abuse survivors are at increased risk for post-assault substance abuse" — "[a]fter Ms. Lane was raped, her drinking dramatically escalated on a regular basis."  (*Id.* at 33.)  Dr. Vanino acknowledged that Lane "developed a problem with alcohol around the age of 23 or 24," well before the alleged assault, but observed that her alcohol use led to her becoming "more physically aggressive" and even "becoming physically abusive and blacking out several times per week" — something that had not occurred prior to the alleged assault.  (*Id.*)  Although Lane apparently stopped consuming alcohol in 2020, Dr. Vanino reported that Lane "continues to constantly use marijuana as a means of numbing overwhelming emotions."  (*Id.* at 33–34.)

Based on the reports of the alleged incident, Dr. Vanino also explained that Lane "experienced a high level of social betrayal from the flight crew on [the Flight]," potentially leading "to negative long-term mental health outcomes and . . . the development of PTSD."  (*Id.* at 34.)  Dr. Vanino wrote that in such cases, "the victim often feels abandoned and begins questioning the dependability and trustworthiness of the general public."  (*Id.*)  In Dr. Vanino's

49

opinion, social betrayal is one of "the most salient factors" that "affect whether a sexual assault victim will develop adverse mental health effects." (*Id.*)

Dr. Vanino next discussed the impact that the alleged assault has had on Lane's relationships. (*Id.* at 35–39.) She wrote that it is common for a "survivor's quality of relationships to decline after a sexual assault," and that "Lane's relationships have certainly been affected." (*Id.* at 35.) Dr. Vanino discussed Lane's difficulty "maintaining friendships" and meeting new people, preventing her from partaking in social activities like taking her son to the park. (*Id.* at 35–36.) Lane reported to Dr. Vanino, however, that "the most significant effect the rape has had on her life was the implosion of her marriage to Jesse Lane." (*Id.* at 36–37.) She reported that though the two were once "happily married," the marriage is "permanently broken" after the alleged incident. (*Id.* at 36.) Relatedly, Lane reported to Dr. Vanino that after the alleged assault, she struggled with intimacy, exacerbating the difficulties in her marriage. (*Id.* at 37–38.) Dr. Vanino explained that this experience is "not uncommon," as survivors are "known to have decreased sensuality and higher levels of anxiety during sexual activity," while other studies "indicate that sexual assault is also associated with increased negative communication and hostility between romantic partners." (*Id.* (internal quotation marks omitted).) Finally, Dr. Vanino discussed how "[s]ince the rape, Ms. Lane has struggled with parenting." (*Id.* at 38–39.) Though Dr. Vanino's report indicated that Lane has never been physically aggressive with her six-year-old son, Lane reported getting much angrier with him while also being unable to give him the attention she needs because of her depression, anxiety, and PTSD. (*Id.*) Lane also "carries heavy guilt and shame for the divorce and for the effect that will have on their son." (*Id.* at 39.) According to Dr. Vanino, research shows that "parents suffering with PTSD" often tend to experience these difficulties with their children. (*Id.* at 38.)

Dr. Vanino then considered the impact that the alleged assault had on Lane's preexisting trauma.  (*Id.* at 39–40.)  She summarized research that shows "the more traumatic experiences that victims of sexual assault endure, the higher are the levels of symptoms such as anxiety, depression, and dissociation."  (*Id.* at 39.)  These repeated incidents can also "affect[] a client's rate of recovery, which then affects the efficacy of mental health treatment," leading to "more complex PTSD and [the] need [for] more experienced treatment providers for longer periods of treatment."  (*Id.*)  Consistent with this research, Dr. Vanino concluded that "there is no doubt that the current assault has exacerbated [Lane's] prior trauma."  (*Id.*)  Dr. Vanino wrote that "it is impossible to separate out Ms. Lane's prior trauma history" when "evaluating the impact of the rape," but she explained that "Lane is able to easily describe the ways that the rape has fueled her prior trauma."  (*Id.*)  Dr. Vanino described how the alleged assault has brought back many of the fears she used to experience, including the fear of ███████████.  (*Id.* at 40.)  Lane has been revisiting the prior traumas she experienced and "thinks of herself now as a child sexual abuse victim more than she ever has."  (*Id.*)  Dr. Vanino concluded that this is consistent with research indicating that "many people with trauma history, such as rape, spouse battering, and child abuse, seem to function relatively well as long as feelings related to the traumatic memories are not stirred up."  (*Id.* (citation and internal quotation marks omitted).)

Turning next to the effect of the assault on Lane's "long-term physical health," Dr. Vanino explained that many studies "establish links between trauma, the impact of psychological stress on the body, and poor health."  (*Id.* at 41–42.)  These studies showed that prolonged and repeated "exposure to the body's flight, fight, or freeze response" can lead to "many lifelong health problems."  (*Id.* at 41.)  Dr. Vanino concluded that "[n]ot surprisingly, the rape has impacted Ms. Lane's health."  (*Id.*)  Lane reported weight loss, lack of sleep, migraines, and

vomiting when triggered.  (*Id.* at 41–42.)  The repeated migraines — occurring "on average twice per month and typically last[ing] a full day" — were evidently not an issue for Lane "prior to the rape."  (*Id.*)

Finally, Dr. Vanino discussed the impact of the alleged assault on "current employment and future earning potential."  (*Id.* at 42–43.)  While she previously "was on the rise as a successful realtor," she has since been "unable to continue showing homes due to anxiety and fear for her safety."  (*Id.* at 42–43.)  Lane has returned to her former employer, but "she has not started selling homes and therefore still doesn't have an income," leaving her future "uncertain." (*Id.* at 43.)  Dr. Vanino explained that Lane's experience is consistent with research showing that "sexual assault and the related trauma response can disrupt survivors' employment in several ways," and that work can often be missed "due to the effects of stress on the body, a decline in physical health, and increased physicians' visits."  (*Id.*)

Dr. Vanino concluded her report by recommending various types of "therapeutic and psychiatric treatment" for Lane, but highlighting that she needs "*consistent* long-term individual therapy with a trauma treatment provider."  (*Id.* at 44–48.)  As a "conservative estimate" of what Lane might need in the future, Dr. Vanino recommended inpatient trauma treatment, individual trauma-specific treatment, group therapy for sexual assault survivors, dialectic behavior group therapy, eye movement desensitization reprocessing, psychiatric treatment, couples therapy, trauma-specific yoga, and "Model Mugging."  (*Id.*)  In total, she estimated that the cost of future recommended treatment could range from $324,880 to $467,680.  (*Id.* at 48.)

### 2. The Court admits Dr. Vanino's expert opinion

Defendant argues that the Court should exclude Dr. Vanino's opinion as unreliable, biased, and unhelpful given the governing Arizona law.  (Def.'s Mem. 23–30.)  The Court addresses each argument in turn.

### A.   Reliability

Defendant argues that Dr. Vanino's opinion should be excluded as unreliable because her "diagnosis of [Lane] fails to materially consider [Lane]'s history of physical and sexual abuse or any related psychological and psychiatric treatment that [Lane] received prior to the alleged incident on the Flight."  (Def.'s Mem. 23.)  This "faulty methodology," Defendant argues, is a sufficient basis to exclude Dr. Vanino's proffered testimony.  (*Id.* at 23–26.)  In support, Defendant contends that in opining on the causation of Lane's symptoms, Dr. Vanino was required by circuit precedent to conduct a "differential diagnosis" to assess possible alternate causes of the alleged injuries.  (*Id.* at 24 (emphasis omitted).)  Defendant argues that without consideration of Lane's prior trauma, Dr. Vanino's diagnosis is insufficient to establish causation.

Plaintiffs respond that Dr. Vanino's expert report did "show a quite extensive acknowledgment and consideration of Plaintiff's history," and that Defendant was required to identify possible alternate causes prior to the preparation of Dr. Vanino's report.  (Pl.'s Opp'n 23–24.)  Plaintiffs assert that instead of timely raising the possible alternate causes, Defendant waited until Dr. Vanino wrote her report and then identified alternate causes based on what Dr. Vanino discussed in her report.  (*Id.*)

 "A differential diagnosis is 'a patient-specific process of elimination that medical practitioners use to identify the "most likely" cause of a set of signs and symptoms from a list of

possible causes.'" *Ruggiero*, 424 F.3d at 254 (quoting *Hall v. Baxter Healthcare Corp.*, 947 F.

Supp. 1387, 1413 (D. Or. 1996)).  "[T]he absence of a differential diagnosis," however, "is not

always fatal to an expert's causation opinion." *Tardif*, 344 F. Supp. 3d at 601.  Such analysis

"may not be required . . . when there are other sufficient indicia of reliability, such as literature

reviews, reviewing medical records, and interviews with the plaintiff." *Id.* at 602 (citation and

internal quotation marks omitted).  Moreover, even when an expert bases their causation opinion

on a differential diagnosis, that opinion "normally should not be excluded because the expert has

failed to rule out every possible alternative cause of a plaintiff's illness." *Davids v. Novartis*

*Pharm. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (quoting *Cooper v. Smith & Nephew,*

*Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)).  Rather, the opinion "must at least address obvious

alternative causes and provide a reasonable explanation for dismissing specific alternate factors

identified by the defendant." *Id.* (quoting *Israel v. Spring Indus., Inc.*, No. 98-CV-5106, 2006

WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006)).

Dr. Vanino's opinion does not, as Defendant asserts, "fail[] to materially consider

Plaintiff's history of physical and sexual abuse."  (*See* Def.'s Mem. 23.)  Nor is her report

excludable for lacking a "differential diagnosis" that assesses possible alternate causes of her

injuries.  (*Id.* at 24.)  Contrary to Defendant's assertions, and as described above, at each step of

her analysis Dr. Vanino explained how the assaults Lane experienced previously — from her

█████████████████████████████ — contributed to each of Lane's

mental health issues.  (*See* Vanino Rep. 8–43.)  She did not state in a conclusory fashion that the

alleged assault exacerbated all of Lane's disorders, and all of Dr. Vanino's analyses were

preceded by extensive literature reviews and discussions of Lane's medical history.  *See Tardif*,

344 F. Supp. 3d at 602.  For example, when discussing Lane's depression, Dr. Vanino relayed

Lane's report that her depression has intensified since the alleged assault, but Dr. Vanino herself did not draw any conclusions regarding whether that assessment is accurate. (*See id.* at 22–23.) When discussing Lane's anxiety, however, Dr. Vanino explained how the literature linking sexual assault to anxiety manifests in the way in which Lane's symptoms have markedly worsened since the alleged assault. (*Id.* at 24–25.) Similarly, Dr. Vanino explained in detail how Lane's PTSD changed and worsened as a result of the alleged assault. (*See id.* at 26–33.) Dr. Vanino's opinion, therefore, did not "ignore[] the obvious possibility that Plaintiff's current symptoms are at all connected to her prior history of trauma and abuse," and is not excludable on this basis.[14] (*See* Def.'s Mem. 26.)

### B.   Bias

Defendant next argues that Dr. Vanino's opinion "presents an objective bias which discredits her reliability." (*Id.* at 27.) In support, Defendant notes that Dr. Vanino prepared her report "over one year after her interview with [Lane]," and only after Lane received "treatment that Dr. Vanino herself recommended to [Lane] to treat her PTSD and depression symptoms caused by the alleged incident on the Flight." (*Id.* at 27–28.)

---

[14]   Dr. Vanino submitted a declaration alongside Plaintiffs' opposition brief, responding to various parts of Defendant's *Daubert* motion. (Vanino Decl.) The first half of the declaration relies only on Dr. Vanino's original expert report, (*id.* at 1–13), while the second half includes her opinions on "the diagnosis the defense discussed in their reports that were submitted after [Vanino's] report was completed," (*id.* at 14–20). These diagnoses include a variety of personality disorders that Defendant asserts could have caused in Lane the symptoms that Dr. Vanino attributes to the alleged sexual assault. (*See supra* sections II.b.i.–ii.) Defendant argues in reply that Dr. Vanino's declaration did not comply with the disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure, and that Plaintiffs are attempting to use the Vanino Declaration to "retroactively support the admissibility of" her testimony, and that the Declaration constitutes impermissible "new opinions" that should be stricken. (Def.'s Reply 10–13.)
As discussed above, Dr. Vanino's expert opinion is admissible based on her report, even without any additional support that her supplemental declaration might provide. The Court does not rely on the declaration in deeming Dr. Vanino's opinion admissible, and therefore declines to decide whether this declaration is admissible at this stage of the litigation.

Plaintiffs argue that any "bias" that Defendant perceives in Dr. Vanino's opinion is an issue to raise on cross-examination, as it goes to her testimony's weight and credibility rather than its admissibility.  (Pls.' Opp'n 24.)

Dr. Vanino's opinion is not excludable for presenting "an objective bias which discredits her reliability."  (Def.'s Mem. 27.)  Even assuming that "Dr. Vanino herself recommended" to Lane the treatment that Lane received to treat her PTSD and depression, Defendant cites no authority to support its assertion that Dr. Vanino's opinion is rendered inadmissible merely because she bases her report in part on recommended treatment.  (*See id*. at 27–28.)  Nor has the Court found any such authority.  To the extent Defendant believes that Dr. Vanino's preference for a certain kind of treatment renders her opinion biased or untrustworthy, Defendant can properly explore this challenge on cross-examination.  *See Amorgianos*, 303 F.3d at 267 (observing that cross-examination is the proper avenue to challenge "reliable, albeit debatable, expert testimony").

## C.   Helpfulness

Finally, Defendant argues that Dr. Vanino's testimony "should be excluded because it would not provide any assistance to the jury's determination of . . . what damages, if any, [Lane] has suffered due to the alleged incident on the Flight."  (Def.'s Mem. 28–30.)  As a result, Defendant argues, Dr. Vanino's opinion "does not assist with the factual issue of apportioning damages."  (*Id.*)  Defendant asserts that Arizona law governs Plaintiffs' negligence claim, and that under governing law, Plaintiffs are "not entitled to compensation for any physical or emotional condition that pre-existed the fault of [Defendant]."  (*Id.* at 29 (citation omitted).)  Defendant argues that Dr. Vanino's report falls short because she herself admitted that she could

not separate out Lane's prior trauma history from the trauma caused by the alleged incident on the Flight.  (*Id.* at 30.)

Plaintiffs challenge Defendant's argument that Dr. Vanino's opinion should be excluded for failing to assist in apportioning damages, and they argue that Defendant misapprehends Arizona law when it faults Dr. Vanino for failing to separate Lane's prior trauma history from that caused by the incident on the Flight.[15]  (Pls.' Opp'n 24–25.)

As Defendant notes, the Court has already determined that the law of Arizona governs Plaintiffs' negligence claim.  (Apr. 2022 Decision 9–20.)  "To establish a claim of negligence under Arizona law, a plaintiff must prove that (1) defendant owed plaintiff some duty, (2) defendant breached that duty, (3) defendant's breach caused plaintiff's injuries, and (4) plaintiff sustained actual damages."  *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822

---

[15]  Plaintiffs argue in response that Defendant erroneously places on Dr. Vanino the burden of apportioning damages.  (Pls.' Opp'n 24–25.)  Plaintiffs contend that this would "usurp[] . . . the role of the jury in applying th[e] law to the facts before it," and that under Arizona law, Defendant is responsible for apportioning damages where "divisibility of the injury [is] impossible."  (*Id.* (first quoting *Nimley*, 414 F.3d at 397; and then citing *Piner v. Superior Court*, 192 Ariz. 182 (1998) (en banc)).)

Defendant clarifies in reply that "Dr. Vanino is not being asked to *actually* apportion damages in a manner that usurp[s] . . . the role of the jury," but she must "provide a factual basis upon which the jury can . . . make their damages determination."  (Def.'s Reply 14 (citation and internal quotation marks omitted).)  Defendant further states that it is not making an argument regarding who bears the burden of apportioning damages under Arizona law; Defendant points out that *Piner*, 192 Ariz. 182, relied on by Plaintiffs, "discussed the indivisible injury rule in Arizona, which deals with apportionment of damages amongst 'multiple, culpable actors' or tortfeasors," while "[t]here is only one alleged tortfeasor in this case, but also pre-existing injury."  (*Id.* at 14 n.5.)

The issue of who has the burden to apportion damages under Arizona law has not been properly raised before the Court.  Moreover, that issue need not be decided to address this particular aspect of Defendant's *Daubert* motion, which disputes only the helpfulness of Dr. Vanino's opinion.  Regardless of who bears the burden of apportioning damages, Dr. Vanino's expert opinion will help the trier of fact determine the degree to which the alleged assault on the Flight worsened Lane's condition.  Neither party disputes that such information would be helpful to the jury.  Accordingly, the Court declines to address the issue of who bears the burden of apportioning damages.

(9th Cir. 2011).  Moreover, Defendant is correct that "Arizona's pure comparative fault scheme protects defendants from bearing more than their fair share of liability for a plaintiff's injuries," and therefore, "the liability of each defendant for damages is several only."  *Cramer v. Starr*, 240 Ariz. 4, 7 (2016) (first quoting *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 26 (2016); and then quoting A.R.S. § 12-2506(A)).

The Court is not persuaded by Defendant's contention that Dr. Vanino's report "would not provide any assistance to the jury's determination of . . . what damages . . . [Lane] has suffered due to the alleged incident on the Flight."  (Def.'s Mem. 28.)  Defendant appears to focus on Dr. Vanino's statement that "it is impossible to separate out Ms. Lane's prior trauma history" when evaluating the impact of the alleged assault, and argues that this "admi[ssion]" renders her entire report unhelpful to the factfinder.  (*See id.* at 30 (quoting Vanino Rep. 39).)  The context of Dr. Vanino's report makes clear, however, that this statement is meant only to highlight that the effects of the alleged assault would not manifest in a manner completely independent of Lane's prior trauma.  As already discussed above, (*supra* sections II.b.iv.1, 2.A), Dr. Vanino describes at multiple points how "the current assault has exacerbated her prior trauma," contrasting preexisting symptoms with those that Lane now experiences, while also acknowledging those that have remained the same.  (*See, e.g.*, Vanino Rep. 39–40.)  Arizona law requires that "the trier of fact assess[] percentages of fault after considering the fault of all persons who contributed to the alleged injury, . . . 'regardless of whether the person was, or could have been, named as a party to the suit.'"  *Cramer*, 240 Ariz. at 7 (quoting A.R.S. § 12-2506(B)).  The Court cannot conclude that Dr. Vanino's extensive discussion of Lane's lifelong mental health struggles would be unhelpful to the factfinder in fulfilling this role, or that Dr.

Vanino "utterly fails" to provide the jury with a factual basis upon which to make a damages determination.  (*See* Def.'s Reply 14.)

Accordingly, the Court admits Dr. Vanino's report.

**III.   Conclusion**

For the reasons stated above, the Court denies Plaintiffs' motion to exclude evidence of Lane's history of sexual abuse and assault, where such evidence is presented for the purposes of identifying sources of Lane's trauma other than the alleged sexual assault on the Flight or apportioning Plaintiffs' damages.  The Court also (1) grants in part and denies in part Plaintiffs' motion to exclude the expert opinions of Dr. Nina Rodd and Dr. Gregory Saathoff; (2) grants in part and denies in part Defendant's motion to exclude the expert opinion of Kim E. Petersen; and (3) denies Defendant's motion to exclude the expert opinion of Dr. Sheri Vanino.

Dated: February 27, 2024
       Brooklyn, New York

                                                       SO ORDERED:


                                                       _____s/MKB_____
                                                       MARGO K. BRODIE
                                                       United States District Judge

59